**UNITED STATES of America, Plaintiff–Appellee,**

**v.**

**Thomas A. WILKINSON, III, Defendant–Appellant.**

**UNITED STATES of America, Plaintiff–Appellee,**

**v.**

**Edward M. CONK, Defendant–Appellant.**

**Nos. 96–4530, 95–4556.**

United States Court of Appeals, Fourth Circuit.

Argued Oct. 2, 1997.

Decided Feb. 25, 1998.

**ARGUED**: Paula Marie Junghans, Martin, Junghans, Snyder & Bernstein, P.A., Baltimore, MD, for Appellants. David T. Maguire, Assistant United States Attorney, Richmond, VA, for Appellee. **ON BRIEF**: Gerald T. Zerkin, Gerald T. Zerkin & Associates, Richmond, VA, for Appellant Wilkinson. Helen F. Fahey, United States Attorney, Andrew G. McBride, Assistant United States Attorney, William L. Finch, Department of Justice Trial Attorney, Richmond, VA, for Appellee.

Before WIDENER, NIEMEYER, and HAMILTON, Circuit Judges.

Affirmed by published opinion. Judge HAMILTON wrote the opinion. Judge WIDENER wrote a separate opinion concurring in part and dissenting in part. Judge NIEMEYER wrote a separate opinion concurring in part and dissenting in part. Judge HAMILTON also wrote a separate opinion, with respect to Part VI.

**. OPINION.**

HAMILTON, Circuit Judge:

. . Thomas Wilkinson, III (Wilkinson) and Edward Conk (Conk) (collectively the Defendants) appeal their convictions and sentences following a jury trial on conspiracy charges, money laundering charges, and various related fraud charges, including wire fraud and bank fraud, stemming from their operation of a company purportedly in the business of financing the accounts receivable of physicians. Conk was also convicted on one count of perjury.

With respect to their money laundering convictions, the Defendants seek reversal on two grounds: (1) the district court committed plain error under Federal Rule of Criminal Procedure 52(b) by failing to instruct the jury that the government had to prove an interstate commerce nexus, and (2) the evidence is insufficient to support the jury's findings as to several essential elements. Conk seeks reversal of his perjury conviction on two grounds: (1) the district court committed plain error by instructing the jury on the wrong perjury statute, and (2) the district court committed plain error by removing the element of materiality from the jury. Conk seeks reversal of his bank fraud conviction on the basis of insufficiency of the evidence. The Defendants both seek reversal of their conspiracy and wire fraud convictions on the ground that the district court erroneously admitted two portions of a summary chart exhibit known as "Exhibit MF–4." Finally, the Defendants challenge their sentences on two grounds: (1) the district court committed error by refusing to grant them down ward departures in their sentences, and (2) the district court failed to make specific findings with respect to its application of the United States Sentencing Guidelines to some of their convictions. For reasons that follow, we affirm the Defendants' convictions and sentences.

I.

Because the Defendants challenge the sufficiency of the evidence on numerous counts for which they were convicted, we present the facts in the light most favorable to the

government, drawing all reasonable inferences in its favor. *See United States v. Burgos,* 94 F.3d 849, 862 (4th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1087, 137 L.Ed.2d 221 (1997). The evidence at trial focused on the Defendants' operation of Medical Payment Systems, Inc. (MPS) in Richmond, Virginia, primarily from the fall of 1988 to the summer of 1991. The Defendants, who were both educated and experienced businessmen, started MPS in the fall of 1988 with the purported objective of lending money to physicians in exchange for a perfected security interest in the physicians' accounts receivable.

To fund this purported objective, the Defendants borrowed money from a Maryland company named Health Line, Inc. (HLI), a subsidiary of Blue Cross Blue Shield of Maryland. Based on representations by the Defendants that MPS was in the business of financing the accounts receivable of physicians, HLI granted MPS a five million dollar line of credit in November 1988. The written loan agreement between MPS and HLI specified that MPS could only use draws on the line of credit to make loans to physicians and that the loans had to be secured by security interests in the accounts receivable of those physicians.

The evidence at trial showed that at the time the Defendants secured the line of credit from HLI, the Defendants intended to use most of the money to fund several of their own separate non-medical businesses that were in poor financial health. The Defendants acted on their illicit intent, ultimately obtaining in excess of three million dollars from HLI through wire transfers by submitting dummy loan requests to HLI via facsimile. The dummy loan requests falsely showed that the funds requested would be secured by certain accounts receivable of particular physicians. These wire transfers and facsimile transmissions were the predicates for seven counts of wire fraud. *See* 18 U.S.C. § 1343. The Defendants' transfers of line of credit funds through MPS to their separate businesses were the predicates for five counts of money laundering (the Promotion Counts). *See* 18 U.S.C. § 1956(a)(1)(A)(i).

In order to conceal their fraudulent scheme on MPS's accounting records, the Defendants gave their separate non-medical businesses bogus names that sounded like the names of actual medical practices. For example, the Defendants gave Day Dream Publishing Company (Day Dream Publishing) the name "American Surgical, Inc." Conk was a substantial part owner of Day Dream Publishing, which was headquartered in California. For a second example, the Defendants gave Hawthorne Construction Excavators, Inc. the name "Health Emergency, Inc." Hawthorne Construction Excavators, Inc. was a Virginia construction company owned by Wilkinson.

By December 1989, the Defendants had nearly exhausted the five million dollar line of credit, and, under the terms of the loan agreement, MPS needed to make substantial interest payments. Thus, in order to continue to promote their scheme to defraud, the Defendants caused their various separate businesses to transfer funds into MPS's bank account at Sovran Bank in Richmond, Virginia. MPS would then use the money to make interest payments to HLI. The transfers from the separate businesses to MPS's account at Sovran Bank were the predicates for six additional money laundering counts (the Concealment Counts). *See* 18 U.S.C. § 1956(a)(1)(B)(i).

Conk was charged with one count of bank fraud premised on the following facts and circumstances. *See* 18 U.S.C. § 1344. Conk managed Day Dream Publishing directly and through his son, Chip Conk. The company began having cash flow problems in the latter part of 1988. By early March 1989, the cash flow problems had not improved and, as a result, the Defendants funneled $80,000 from MPS to Day Dream Publishing.

On March 27, 1989, the Bank of Montecito, a federally insured bank in the State of California, extended credit to Day Dream Publishing in the amount of 1.65 million dollars through a line of credit, evidenced by a note (the Note). The Note had an expiration date of May 1, 1989. The Note was secured by a blanket but revolving security interest in all of Day Dream Publishing's property, including purchase orders, accounts receivable, and

the proceeds thereof. The terms of the agreement creating the blanket security interest provided that Day Dream Publishing would not, without the prior written consent of the Bank of Montecito, encumber or otherwise dispose of any collateral or any interest in the collateral. The Bank of Montecito did not bear the entire risk of loss on the Note, because a man named Mr. Tobes purchased half of the Note from the Bank of Montecito.

May 1, 1989 came and went without Day Dream Publishing satisfying the Note. The Bank of Montecito, however, did not call the loan in hopes of repayment in the near future. The Bank of Montecito continued to monitor the financial health of Day Dream Publishing by reviewing the financial reports submitted by Day Dream Publishing.

In August 1989, Day Dream Publishing landed a large purchase order from the Big B drug store chain to print calendars containing coupons. Unfortunately, Day Dream Publishing did not have sufficient funds to pay for the design and production of the order. Conk came to the rescue by borrowing an additional $316,000 for Day Dream Publishing from MPS, $116,000 of which went from MPS's account with Sovran Bank straight to the printer that Day Dream Publishing had hired to print the calendars. In early September 1989, the Bank of Montecito expressly extended the maturity date of the Note to January 3, 1990.

After receiving the calendars, Big B issued Day Dream Publishing a check, dated November 15, 1989, for $410,425.56 as payment for the calendars. Rather than depositing the check into Day Dream Publishing's account, Conk caused Day Dream Publishing's comptroller to endorse the check in favor of MPS as repayment on the loans from MPS. Conk did not obtain permission from the Bank of Montecito to divert the proceeds of the Big B account receivable to MPS or

otherwise inform the Bank of Montecito that it was in receipt of the "Big B check." Day Dream Publishing eventually paid the Note in full.[1]

Turning back to HLI's relationship with MPS, in December 1990, HLI hired an outside auditing firm to evaluate the integrity of its collateral. HLI took this step only after it tried for several months without success to obtain certain information from MPS regarding the condition of its collateral. The Defendants stonewalled the efforts of the auditing firm by refusing it access to MPS's books and records. HLI became suspicious and called the loan approximately six months later. When MPS failed to satisfy the outstanding amount of the loan, HLI filed a civil suit against MPS and the Defendants in the United States District Court for the Eastern District of Virginia. During a deposition in that case, Conk falsely denied knowledge that "American Surgical" was the fictitious name used in MPS's books for Day Dream Publishing. This statement was the subject of the count of perjury against Conk. HLI ultimately obtained a 5.3 million dollar judgment against MPS and the Defendants in July 1991.

On June 21, 1995, a federal grand jury in the United States District Court for the Eastern District of Virginia returned a twenty-four count indictment against the Defendants. Count 1 charged the Defendants with conspiracy to defraud the United States in violation of 18 U.S.C. § 371. Counts 2 through 10 charged the Defendants with wire fraud in violation of 18 U.S.C. § 1341. Count 11 charged Conk with bank fraud in violation of 18 U.S.C. § 1344. Counts 12 through 17 charged the Defendants with laundering money with the intent to promote the carrying on of wire fraud in violation of 18 U.S.C. § 1956(a)(1)(A)(i). Counts 18 through 23 charged the Defendants with laundering

1. Approximately during the same time that the Bank of Montecito extended Day Dream Publishing the 1.65 million dollar line of credit, the Bank of Montecito also extended Day Dream Publishing an $850,000 line of credit. Unlike the 1.65 million dollar line of credit, which involved a blanket security interest in Day Dream Publishing's inventory, accounts receivable, and the proceeds thereof, the $850,000 line of credit was

secured by specifically identified accounts receivable of Day Dream Publishing. The subjects of the specifically identified accounts receivable were to pay the Bank of Montecito directly. We can find no evidence in the record to establish that the Big B account receivable was one of the accounts receivable connected to the $850,000 line of credit.

money with the knowledge that the transactions were designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the proceeds involved in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Count 24 charged Conk with perjury in violation of 18 U.S.C. § 1623.

A jury acquitted Wilkinson and Conk on Counts 10, 15, 22, and 23 and convicted them on the remaining counts. At sentencing, the Defendants sought downward departures in their sentences on the ground that the facts establishing their wire fraud convictions supplied the basis for their money laundering convictions. The district court refused to grant the Defendants downward departures, sentencing Wilkinson to 87 months' imprisonment and Conk to 99 months' imprisonment. The district court also ordered that the Defendants were joint and severally liable for $1,662,658 in restitution. The Defendants noted a timely appeal.

### II.

The Defendants first challenge the sufficiency of the evidence to support their money laundering convictions under 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i). We must sustain these convictions if there is substantial evidence to support them when the evidence and reasonable inferences from it are viewed in the light most favorable to the government. *See Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469–70, 86 L.Ed. 680 (1942); *Burgos,* 94 F.3d at 862. "[I]n the context of a criminal action, substantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Burgos,* 94 F.3d at 862.

### A. *The Promotion Counts.*

■ Counts 12, 13, 14, 16 and 17 charged that the Defendants violated 18 U.S.C. § 1956(a)(1)(A)(i). In order to sustain a conviction under the statute, the government must prove: (1) the defendant conducted or attempted to conduct a financial transaction having at least a *de minimis* effect on interstate commerce or involving the use of a financial institution which is engaged in, or

the activities of which have at least a *de minimis* effect on, interstate commerce, *see United States v. Peay,* 972 F.2d 71, 74 (4th Cir.1992); (2) the property that was the subject of the transaction involved the proceeds of specified unlawful activity; (3) the defendant knew that the property involved represented the proceeds of some form of unlawful activity; and (4) the defendant engaged in the financial transaction with the intent to promote the carrying on of specified unlawful activity. *See* 18 U.S.C. §§ 1956(a)(1)(A)(i) and (c).

With respect to counts 12–14 and 16–17, the indictment essentially alleged that the Defendants' transfers of money fraudulently obtained from HLI through MPS to their non-medical businesses constituted financial transactions involving proceeds from a specified unlawful activity, namely wire fraud, conducted with the intent to promote the carrying on of wire fraud. The Defendants take issue with the sufficiency of the evidence with respect to the interstate commerce element and whether the Defendants conducted the transactions with the intent to promote wire fraud. We conclude the evidence is sufficient with respect to each of these elements and address each in turn.

■ The Defendants argue that evidence of a *de minimis* effect on interstate commerce is lacking, because the Promotion Counts only involved the intrastate transfers of funds. For example, Count 17 was premised on a check drawn on MPS's account at Signet Bank in Virginia in favor of Hawthorne Construction Excavators, Inc., a Virginia company. Although the Promotion Counts only involved the intrastate transfers of HLI line of credit funds, the record contains more than sufficient evidence to establish that those transfers had at least a *de minimis* effect on interstate commerce. Specifically, the evidence firmly established that the Defendants' transfers affected interstate commerce by violating MPS's loan agreement with an out-of-state company, HLI.

■ Relying on *United States v. Heaps,* 39 F.3d 479 (4th Cir.1994), and *United States v. Jackson,* 935 F.2d 832 (7th Cir.1991), the

Defendants argue that their unsecured transfers of funds to their nonmedical businesses in no way "promoted" wire fraud. Rather, the Defendants contend that their unsecured transfers merely amounted to lifestyle expenditures. *See Jackson,* 935 F.2d at 841 (holding that defendant's expenditure of proceeds from drug sale on items used solely to maintain personal lifestyle did not "promote" specified crime of drug dealing).

We believe there is sufficient evidence of promotion. The Defendants understood that the use of financial transactions from MPS to the non-medical businesses was an essential part of their scheme to misapply funds fraudulently obtained from HLI. Otherwise, HLI would have transferred funds directly to the non-medical businesses. To avoid this result, MPS engaged in these transactions with the nonmedical businesses to promote the overall scheme. Because the transfer of money from MPS to the non-medical businesses was integral to the success of the overall scheme, it is undeniable that these transactions were designed to promote the unlawful activity of wire fraud. That the transactions were part of the overall scheme to defraud or could form the basis of a wire fraud charge is of no consequence. *Cf. United States v. Smith,* 44 F.3d 1259, 1265 (4th Cir.1995).

Furthermore, the facts here are materially distinguishable from the facts in *Heaps* and *Jackson,* the two cases relied upon by the Defendants. In *Heaps,* the promotion counts were based on payments for drugs to a drug dealer, who then placed the money in a box in his apartment. *Heaps,* 39 F.3d at 485. We held that the receipt of the proceeds of the drug deal could not also serve as the predicate of a promotion count. *See id.* at 485–86. Otherwise "virtually *every* sale of drugs would be an automatic money laundering violation as soon as money changed hands." *Id.* at 485. Thus, in *Heaps,* we required that the money laundering transaction be separate and distinct from the underlying offense generating the money. In the present case, the promotion counts satisfy this requirement. They were predicated, not on the transfers into MPS's account, but rather on the transfers from MPS's account to their non-medical businesses, thus misap-

propriating HLI line of credit funds to infuse cash into those businesses.

*Jackson* is inapposite as well. In *Jackson,* the Seventh Circuit held that proof of the defendant drug dealer's purchase of a cellular telephone, making rental payments, and making out checks to cash with funds he obtained from the sale of drugs could not be viewed as promoting his drug dealing for purposes of § 1956(a)(1)(A)(i), because the government did not offer concomitant proof that these expenditures played some role in the defendant's drug dealing operation. *Jackson,* 935 F.2d at 841. In contrast to *Jackson,* in the present case the evidence links the transfer of the ill-gotten funds to the specified criminal activity. In the context of a fraud case such as we have here, when proceeds are used in a transaction to commit the next step in a scheme to defraud, it is clear that the financial transaction advances and furthers the progress of the next step. We, accordingly, reject the Defendants' challenge to the sufficiency of the government's proof that they engaged in the financial transactions at issue with the intent to promote the carrying on of wire fraud.

### B. *Concealment Counts.*

■ Counts 18, 19, 20 and 21 charged that the Defendants violated 18 U.S.C. § 1956(a)(1)(B)(i). In order to sustain a conviction under that provision, the government must prove: (1) the defendant conducted or attempted to conduct a financial transaction having at least a *de minimis* effect on interstate commerce or involving the use of a financial institution which is engaged in, or the activities of which have at least a *de minimis* effect on, interstate commerce, *see Peay,* 972 F.2d at 74; (2) the property that was the subject of the transaction involved the proceeds of specified unlawful activity; (3) the defendant knew that the property involved represented the proceeds of some form of unlawful activity; and (4) the defendant knew that the transaction was designed in whole or part, to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the unlawful activity. *See* 18 U.S.C. §§ 1956(a)(1)(B)(i) and (c).

The government premised the Concealment Counts on the repayments from the Defendants' non-medical businesses to MPS, and the cover-up of the source of those repayments on MPS's books. According to the Defendants, the government's offer of proof on the Concealment Counts was deficient as to the first, second and fourth elements. Our review of the evidence reveals that sufficient evidence supports each of these elements.

■ With respect to the first or interstate commerce element, the record establishes that after each repayment, the Defendants faxed a "Loan Status Report" from MPS in Virginia to HLI in Maryland that reported the receipt of the repaid funds, but failed to disclose any source of the repaid funds. By failing to disclose the true source of these funds, each Loan Status Report gave HLI the false impression that the funds originated from legitimate medical businesses as required by the written loan agreement between MPS and HLI. Accordingly, we are more than satisfied that the repayments had at least a *de minimis* effect on interstate commerce.

■ With respect to the second element, the Defendants' convictions on Counts 18 through 21 will stand as long as the jury, viewing the evidence in the light most favorable to the government, could infer that the transfers into MPS's account "involved" wire fraud proceeds for purposes of § 1956(a)(1). To do so, the government need not prove that all of the money involved in the transfers constituted the proceeds of wire fraud; it is sufficient if the government proves that at least part of the money represented such proceeds. *See, e.g., United States v. Cancelliere,* 69 F.3d 1116, 1120 (11th Cir.1995); *Jackson,* 935 F.2d at 840; *cf. United States v. Moore,* 27 F.3d 969, 976–77 (4th Cir.1994) (stating that 18 U.S.C. § 1957 does not require the government to trace origin of funds from sale of assets that were purchased with commingled illegally-acquired and legally-acquired funds). Furthermore, when the funds used in a particular transaction originated from a single source of commingled, legally- and illegally-acquired funds, it may be presumed that the transacted funds, at least up to the full amount originally derived from crime, were the proceeds of the criminal activity. *Cf. Moore,* 27 F.3d at 976 (holding same in context of 18 U.S.C. § 1957, the sister money laundering statute to 18 U.S.C. § 1956).

Viewing the evidence in the light most favorable to the government, we conclude that substantial evidence supports that the repayments represented, in part, the proceeds of the Defendants' wire fraud. The uncontradicted evidence at trial showed that each repayment derived from a commingled account, and that the amount of the repayment was less than the amount originally transferred as part of the Defendants' wire fraud. Therefore, the jury was entitled to presume that the repayments constituted the proceeds of the Defendants' wire fraud. *Cf. Moore,* 27 F.3d at 976–77.

■ With respect to the fourth element— that the Defendants knew the transactions were designed, in whole or part, to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the unlawful activity, *see* 18 U.S.C. § 1956(a)(1)(B)(i)—the Defendants argue there was insufficient evidence of structuring. *See United States v. Gilliam,* 975 F.2d 1050, 1056 (4th Cir.1992) (stating that in a prosecution under § 1956(a)(1)(B)(i), the government must prove "a specific intent to structure a transaction so as to conceal the true nature of the proceeds."). According to the Defendants, their doctoring of MPS's books to conceal the source of the funds transferred cannot count as their having "structured" the transactions because the transactions (the transfer of funds between bank accounts) had already been completed.

The Defendants' argument takes an overly narrow view of the term "transaction" as found in 18 U.S.C. § 1956(a)(1). Section 1956 defines "transaction," in relevant part, as including "a ... transfer, delivery, or other disposition, and with respect to a financial institution includes a deposit, ... transfer between accounts, ... or any other payment, transfer, or delivery by, through, or to a financial institution, by whatever means effected." 18 U.S.C. § 1956(c)(3). The evidence, viewed in the light most favorable to the government, supports the jury's finding that the Defendants had a specific intent to structure their transactions so as to conceal or disguise the true nature and source of the repayments. The transactions here involved the Defendants' transfer of funds between

bank accounts *with the knowledge* that the receiver of the funds, MPS, would doctor the books to conceal the true nature and source of the funds. The jury was entitled to infer that the Defendants would not have transferred the funds unless they knew that MPS would doctor the books upon receipt of the funds, and thus was entitled to find that the Defendants structured the transactions so as to conceal their true nature and source.

For these reasons, we reject the Defendants' challenge to the sufficiency of the government's proof with respect to the first, second and fourth elements on the Concealment Counts. In sum, we reject the Defendants' challenge to the sufficiency of the evidence supporting their money laundering convictions.

## III.

The Defendants next seek reversal of their money laundering convictions, Counts 12–14 and 16–21, under Federal Rule of Criminal Procedure 52(b), on the ground that the district court committed plain error by failing to charge the jury that the financial transactions that were the subject of the money laundering counts had to have either (1) had at least a *de minimis* effect on interstate commerce or (2) involved the use of a financial institution which is engaged in, or the activities of which have at least a *de minimis* effect on, interstate commerce. *See* 18 U.S.C. § 1956(c)(4); *Peay,* 972 F.2d at 74. Because the Defendants failed to note a timely objection at trial to the district court's failure to so instruct the jury, they are correct in asserting that we may only review for plain error. *See United States v. Olano,* 507 U.S. 725, 731, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993); *see also* Fed.R.Crim.P. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").

Under the plain error analysis clarified by the Supreme Court in *Olano,* an appellate court has the discretion to correct a forfeited error under Federal Rule of Criminal Procedure 52(b), where: (1) there is an error; (2) the error is plain; (3) the error affects substantial rights; and (4) the court determines, after examining the particulars of the case, that the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *See Olano,* 507 U.S. at 732, 113 S.Ct. at 1776–77 (alteration in original) (internal quotation marks omitted).

We have no trouble in concluding that the first two prongs of the *Olano* test are satisfied here. "Proof of some effect on interstate commerce is essential to show" a violation of 18 U.S.C. § 1956. *See Peay,* 972 F.2d at 74. Here, the district court failed to instruct the jury on the interstate commerce element of the money laundering counts. Such failure constitutes error. *See United States v. Forbes,* 64 F.3d 928, 934 (4th Cir. 1995) (stating that the Sixth Amendment's right to trial by jury includes a right to have the jury make every factual finding essential to a conviction; thus, failure to instruct the jury that it must make a finding on an essential element is constitutional error). The first prong of *Olano,* then, is satisfied. The holding of *Peay* requiring proof of a *de minimis* effect on interstate commerce is clear, satisfying the second prong of *Olano,* which requires that the error be plain. *See Olano,* 507 U.S. at 734, 113 S.Ct. at 1777–78 (explaining that the word "'plain'" is "synonymous with 'clear' or, equivalently,'obvious' ").

Unless we conclude that the jury necessarily made the required finding despite the failure to instruct, *see, e.g., Forbes,* 64 F.3d at 935, then we must conclude that the failure to instruct affected Conk's substantial rights, *see United States v. David,* 83 F.3d 638, 647 (4th Cir.1996) ("[T]he failure to instruct on an element of the crime, where the jury never made the constitutionally required findings, is within that 'special category' of forfeited errors, and satisfies *Olano*'s third prong.").[2] The record before us gives no indication that despite the district court's failure to instruct, the jury necessarily found

---

2. In *Johnson v. United States,* —— U.S. ——, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997), the Supreme Court specifically did not address whether a failure to instruct on an essential element of a crime is an error that falls within the limited classes of errors that have been found to affect substantial rights. *See id.* at 1550. Thus, our decision in *David* remains good law on this point.

that the Defendants' conduct under the Promotion Counts had at least a *de minimis* effect on interstate commerce. For example, no other instruction encompassed the missing instruction. Accordingly, the third prong of *Olano* is satisfied.

We cannot conclude, however, that the fourth prong of *Olano* is satisfied because, after examining the particulars of this case, we cannot say that the forfeited error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *See Olano*, 507 U.S. at 732, 113 S.Ct. at 1776 (alteration in original) (internal quotation marks omitted). Recently, in *Johnson*, —— U.S. at ——, 117 S.Ct. at 1544, the Supreme Court concluded that *Olano*'s fourth prong was not met under nearly identical circumstances. In *Johnson*, the district court erroneously failed to submit the issue of materiality to the jury in a perjury prosecution under 18 U.S.C. § 1623. *See id.* at ——, 117 S.Ct. at 1549. The Supreme Court assumed without deciding that the error affected Johnson's substantial rights, and thus assumed the third prong of *Olano* was met. *See id.* at —— — ——, 117 S.Ct. at 1549–50. The Supreme Court concluded that *Olano*'s fourth prong was not met in the face of the following circumstances: (1) the evidence in the record of materiality was "overwhelming"; (2) the issue of materiality was essentially uncontroverted at trial and remained so on appeal; and (3) Johnson did not present a plausible argument, in either her brief to the Eleventh Circuit or her brief to the Supreme Court, that her false statement was immaterial. *Id.* at ——, 117 S.Ct. at 1550.

Here, as previously stated, the record contains overwhelming evidence of an effect on interstate commerce with respect to the Promotion Counts and the Concealment Counts. With respect to the Promotion Counts, the evidence firmly established that the Defendants' transfers had at least a *de minimis* effect on interstate commerce by violating MPS's loan agreement with an out-of-state company, HLI. With respect to the Concealment Counts, the record firmly establishes that the transfers had a *de minimis* effect on interstate commerce by precipitating the faxing of Loan Status Reports from MPS in

Virginia to HLI in Maryland falsely implying that the sources of the transfers were medical businesses. Furthermore, this evidence stands completely uncontradicted in the record. Moreover, that the Defendants' conduct as alleged in the money laundering counts had at least a *de minimis* effect on interstate commerce was completely uncontroverted at trial. Finally, the Defendants have not offered any plausible argument that such evidence fails to establish the requisite effect on interstate commerce. As the Supreme Court concluded in *Johnson*, we conclude that this is not a case where we should exercise our discretion to correct a forfeited error under Federal Rule of Criminal Procedure 52(b). *See id.* at ——, 117 S.Ct. at 1550.

## IV.

Next, Conk seeks reversal of his perjury conviction for making a false declaration during a civil deposition, Count 24, on the ground that the district court's instructions on this count constituted plain error under Federal Rule of Criminal Procedure 52(b). Specifically, Conk complains that the district court instructed the jury on the wrong crime and erroneously removed from the jury's consideration the issues of whether his alleged false declaration was material and under oath. Conk acknowledges his failure to object to these instructions. Thus, we examine the district court's instructions regarding perjury and consider whether Federal Rule of Criminal Procedure 52(b) entitles him to relief from his perjury conviction.

### A. *The District Court's Instructions Regarding Perjury.*

■ To convict Conk of perjury under 18 U.S.C. § 1623(a) as alleged in Count 24, the government had the burden of proving beyond a reasonable doubt that Conk: (1) knowingly made a(2) false (3) material declaration (4) under oath (5) in a proceeding before or ancillary to any court of the United States. *See* 18 U.S.C. § 1623(a); *cf. United States v. Friedhaber*, 856 F.2d 640, 642 (4th Cir.1988) (*en banc*) (perjury before a

grand jury).[3] The third and fifth elements deserve some elaboration in the context of this case. We have consistently held that in a § 1623 prosecution, the third or materiality element is met if the declaration at issue "'has a natural tendency to influence, or is capable of influencing, the decision-making body to which it was addressed.'" *United States v. Dickerson,* 114 F.3d 464, 466 (4th Cir.1997) (perjury before grand jury) (quoting *United States v. Littleton,* 76 F.3d 614, 618 (4th Cir.1996) (perjury before grand jury). We have not had an occasion to apply this articulation of the materiality standard in the context of a prosecution for perjury during a civil deposition. Given that a deponent's testimony is not actually addressed to a decision-making body, this standard does not neatly apply when, as here, the defendant is charged with committing perjury during a civil deposition. We note that the Second Circuit has adopted a materiality standard for purposes of a § 1623 prosecution for perjury during a civil deposition. *See United States v. Kross,* 14 F.3d 751, 754 (2d Cir. 1994). In the Second Circuit, a false statement during a civil deposition is material if a "truthful answer might reasonably be calculated to lead to the discovery of evidence admissible at the trial of the underlying suit." *Id.* The Fifth Circuit has adopted a similar standard. *See United States v. Holley,* 942 F.2d 916, 924 (5th Cir.1991) (holding that in a § 1623 prosecution for perjury during a civil deposition, materiality is not limited to issues specifically raised at trial or evidence admissible at trial, but includes matters properly the subject of and material to a deposition under Federal Rule of Civil Procedure 26(b)(1)). The Sixth and Ninth Circuits have adopted a considerably higher standard of materiality in a § 1623 prosecution for perjury during a civil deposition. *See United States v. Clark,* 918 F.2d 843, 846 (9th Cir. 1990), *overruled on other grounds by United States v. Keys,* 95 F.3d 874 (9th Cir.1996), *cert. granted and judgment vacated,* —— U.S. ——, 117 S.Ct. 1816, 137 L.Ed.2d 1025 (1997); *United States v. Adams,* 870 F.2d 1140, 1146–48 (6th Cir.1989). In the Sixth and Ninth Circuits, a false statement during a civil deposition is material if the topic of the statement is discoverable and the false statement itself had the tendency to affect the outcome of the underlying civil suit for which the deposition was taken. *Clark,* 918 F.2d at 847; *Adams,* 870 F.2d at 1147. As we will explain later, it is not necessary in this case that we decide which among these standards we would adopt for our circuit.

The fifth prong requires that the declaration at issue be made in a proceeding before or ancillary to a court of the United States. We note that this prong is satisfied upon sufficient evidence that the defendant made the false statement during a deposition in a federal civil case. *See United States v. McAfee,* 8 F.3d 1010, 1013–14 (5th Cir.1993) (holding that a deposition in a federal civil case is an ancillary proceeding within the meaning of 18 U.S.C. § 1623).

With the requirements of a § 1623(a) prosecution in mind, we now turn to survey the district court's instructions to the jury regarding perjury in the present case. The district court began its instructions to the jury regarding perjury by generally stating that § 1623 provides, in pertinent part, that "[w]hoever under oath in any proceeding before any court or grand jury of the United States knowingly makes any false, material declaration is guilty of a crime." (J.A. 253). The district court next attempted to break the statute down into the individual elements that must be proven. In doing so, the district court blended the essential elements of a § 1623(a) prosecution with a § 1621(1) prosecution. Section 1621(1) provides in pertinent part:

Whoever—

(1) having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, decla-

---

**3.** In pertinent part, § 1623(a) provides:
 Whoever under oath ... in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false

material declaration ... shall be fined under this title or imprisoned not more than five years, or both.
18 U.S.C. § 1623(a).

ration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true; ... is guilty of perjury....

18 U.S.C. § 1621(1).

Specifically, the district court instructed the jury that in order to convict Conk of perjury as alleged in Count 24, it must be convinced that the government has proven each of the following beyond a reasonable doubt:

First, that the defendant testified under oath in a proceeding for which a law of United States authorizes the administration of an oath. Second, the oath was administered by a qualified person. Third, the defendant knowingly made the false material statement detailed in the indictment. And fourth, that the defendant acted willfully and contrary to the oath that had been given.

(J.A. 253). The district court then instructed the jury as follows:

Now, [t]he Court is required by law to decide under the essential element one, whether or not the proceeding which the defendant testified was one during which an oath may be administered, and under the essential element two whether the oath was given by someone qualified to administer oath. In this case there is no issue as to those two elements.

With respect to the first element, the defendant took an oath to testify truthfully, the evidence shows, and there appears to be no dispute that the defendant appeared for purposes of a deposition in the civil case before this division of United States District Court in a case entitled *Health Line, Inc[.] versus Medical Payment Services, Inc[.], MedPay.* Thomas A. Wilkinson [and] Edward M. Conk ... took an oath to testify truthfully. The Court will determine the second element, that is, the materiality as a matter of law.

(J.A. 253–54). The district court then instructed the jury on the particulars of the elements of falsity and acting knowingly. Finally, the district court concluded its perjury instructions by instructing the following:

The false or fraudulent statement made must be related to a material fact. A material fact is one which would reasonably be expected to be of concern to a reasonable and prudent person in relying upon the representations or statement in making the decision.

This means that if you find a particular statement of fact to have been false, you must determine whether that statement was one that had a natural tendency to influence or was capable of influencing the examiner from pursuing his investigation, the resolution of an issue in dispute, any decisions of the court, or the outcome of the law suit.

(J.A. 256–57).

### B. *Were the instructions erroneous?*

Having surveyed the district court's perjury instructions, we now turn to consider whether the errors in the instructions alleged by Conk warrant reversal of his perjury conviction pursuant to Federal Rule of Criminal Procedure 52(b).

#### 1. The Substitute Instruction.

 We have no trouble in concluding that the district court erroneously instructed the jury with respect to Count 24 to the extent that the district court substituted the elements of the crime of "Perjury generally," 18 U.S.C. § 1621, for the elements of the crime of "False declarations before a grand jury or court," 18 U.S.C. § 1623. As previously stated, to convict Conk of perjury under § 1623 as alleged in Count 24, the government had to prove that Conk (1) knowingly made a (2) false (3) material declaration (4) under oath (5) in a proceeding before or ancillary to any court or grand jury of the United States. *See* 18 U.S.C. § 1623(a). The district court's substitute instruction covered all of these elements except for the last one. On that element, the district court instructed that, in order to convict Conk of perjury, he must have made the allegedly false statement in a proceeding for which a law of the United States authorizes the administration of an oath rather than in a proceeding ancillary to any court or grand jury of the United States. Thus,

the district court failed to instruct on an essential element of § 1623(a). This was error, and the error was plain. Thus, the first and second prongs of *Olano* are satisfied.

Again, unless we conclude that the jury necessarily made the required finding despite the failure to instruct, *see, e.g., Forbes,* 64 F.3d at 935, then we must conclude that the failure to instruct affected Conk's substantial rights, *see David,* 83 F.3d at 647. The record before us gives no indication that, despite the district court's failure to instruct, the jury necessarily found that Conk made the allegedly false statement at issue in a proceeding before or ancillary to any court or grand jury of the United States. No other instruction encompassed the missing instruction. Moreover, any chance at inquiring whether the jury necessarily found that Conk made the allegedly false statement in a proceeding ancillary to any court or grand jury of the United States by finding that he made the allegedly false statement in a proceeding for which a law of the United States authorizes the administration of an oath is foreclosed by the district court's conclusive instruction on the latter issue. Accordingly, *Olano*'s third prong is satisfied. *See David,* 83 F.3d at 647.

We now must consider whether the forfeited error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *See Olano,* 507 U.S. at 732, 113 S.Ct. at 1776 (alteration in original) (internal quotation marks omitted). We conclude that it does not, because overwhelming evidence establishes that Conk made the declaration at issue during a proceeding ancillary to a court of the United States, specifically a civil deposition; such evidence stands uncontradicted in the record; Conk did not dispute this element below and does not do so on appeal; and finally, Conk fails to set forth a plausible argument that he did not make the declaration at issue during a proceeding ancillary to a court of the United States. Under these circumstances, the fourth prong of *Olano* is not satisfied, *see Johnson,* —— U.S. at ——, 117 S.Ct. at 1550, and thus, we will not reverse Conk's perjury conviction on this basis.

### 2. Conclusive Instruction Regarding Whether Conk Made The Alleged False Statement Under Oath.

We have no trouble in concluding that the district court's conclusive instruction that the false declaration at issue in Count 24 was made under oath satisfies the first three prongs of *Olano.* There is no doubt that an essential element of a § 1623(a) prosecution is that the defendant has made the false declaration under oath. *See Friedhaber,* 856 F.2d at 642. The statutory text of § 1623(a) expressly requires that the false declaration have been made "under oath." 18 U.S.C. § 1623(a). Thus, the district court violated Conk's Sixth Amendment right to have a jury make every factual finding essential to his convictions when it instructed the jury that the government had conclusively established this element of the offense. *See United States v. Johnson,* 71 F.3d 139, 142–43 (4th Cir.1995) (holding the district court's instruction to the jury that deprived the jury of the opportunity to make a factual finding on an essential element of the offense constituted Sixth Amendment violation). The error was plain, and because no other instruction appears to have neutralized the error, we conclude that the error affected Conk's substantial rights. *See David,* 83 F.3d at 647.

Again, however, we cannot conclude that the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *See Olano,* 507 U.S. at 732, 113 S.Ct. at 1776 (alteration in original) (internal quotation marks omitted). First, the evidence on this issue is overwhelming in that Conk admitted at trial that he testified under oath at the civil deposition on July 10, 1991 as alleged in Count 24. Second, he does not argue the invalidity of this admission on appeal. Third and finally, we fail to conceive of a plausible argument that Conk did not make the declaration at issue under oath. Under these circumstances, we cannot say that *Olano*'s fourth prong is satisfied. Accordingly, we will not reverse Conk's conviction on Count 24 on the basis of the district court's conclusive instruction that the alleged false declaration was made under oath. *See Johnson,* —— U.S. at ——, 117 S.Ct. at 1550.

### 3. Conclusive Instruction on Materiality.

■ Conk also complains that the district court committed plain error by removing the element of materiality from the jury. He points to the district court's instruction during final instructions that "[t]he Court will determine the second element, that is materiality, as a matter of law." (J.A. 254). The government argues that this instruction does not constitute error because the district court subsequently instructed the jury that it had to make a finding on the issue of materiality and gave the jury the standard to apply in deciding the issue.

■ Again, we have no trouble in concluding that the conclusive instruction at issue satisfies the first three prongs of *Olano*. The law is settled that in a § 1623 prosecution, the issue of materiality must "be decided by the jury, not the court." *Johnson,* ——— U.S. at ———, 117 S.Ct. at 1548. Accordingly, the district court's instruction to the jury that the court was responsible for deciding the issue of materiality with respect to Count 24 was error. Furthermore, we conclude the error is clear, and thus plain. *See id.* at ———, 117 S.Ct. at 1549. Finally, we conclude the error affected Conk's substantial rights, because we cannot conclude that the jury made the constitutionally required finding of materiality. *See David,* 83 F.3d at 647. Despite the district court's subsequent instruction to the jury that it should decide the issue of materiality, without an instruction telling the jury to disregard the previous erroneous instruction, we cannot conclude that the jury failed to follow the previous erroneous instruction. *See United States v. Varner,* 748 F.2d 925, 927 (4th Cir.1984); *United States v. Walker,* 677 F.2d 1014, 1016–17 n. 3 (4th Cir.1982) (stating that, with respect to directly conflicting final jury instructions, where one is clearly prejudicial and the other not, reversal is warranted, because the jury "might have followed the erroneous instruction").

Yet again, we are left to consider whether the last prong of *Olano* is met, and again, we conclude that it is not. On this record, there is simply no basis for concluding that the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Olano,* 507 U.S. at 732, 113 S.Ct. at 1776 (alteration in original) (internal quotation marks omitted). As set forth above, the standard of materiality in the context of a civil deposition has not been finally determined in our circuit. However, we need not decide which among the differing standards we would adopt, because overwhelming evidence establishes that the nature of Conk's false declaration unquestionably meets the more stringent standard adopted by the Sixth and Ninth Circuits requiring that the topic of the declaration at issue be discoverable and have the tendency to affect the outcome of the civil suit involved. *See Clark,* 918 F.2d at 847; *Adams,* 870 F.2d at 1147. Here, the topic of Conk's false declaration was unquestionably discoverable and the false declaration itself undeniably had the tendency to affect the outcome of HLI's civil suit against MPS, Conk, and Wilkinson for breach of contract and fraud. Specifically, the evidence firmly establishes that HLI's civil suit was prompted in part by its discovery through an investigative audit that many of the health care companies listed on MPS's books were fictitious. Thus, it is beyond cavil that information regarding whether Conk had any knowledge of the fictitious name "American Surgical" as listed on MPS's books "appear[ed] reasonably calculated to lead to the discovery of admissible evidence" in HLI's civil suit. Fed.R.Civ.P. 26(b)(1). Furthermore, Conk's false denial of knowledge of "American Surgical" irrefutably had the tendency to affect the outcome of the civil suit in that, at a minimum, it had the tendency to exculpate him with respect to HLI's claims of fraud and breach of contract. Indeed, we would characterize the evidence of materiality in this case as overwhelming. A further factor weighing in favor of not recognizing the district court's erroneous mandatory instruction on materiality is that the evidence of materiality is uncontradicted. Beyond that, Conk did not dispute the materiality of the declaration at issue below, and he has failed to present a plausible argument of immateriality before this court. Again, we are faced with circumstances nearly identical to those found in *Johnson,* ——— U.S. at ———, 117 S.Ct. at 1544, where the Supreme Court refused to recognize a district court's error in

removing the element of materiality from the jury, and again, we conclude that *Olano* 's fourth prong is not satisfied.

We note that our conclusion is in accord with three of our sister circuits that have considered the satisfaction of *Olano*'s fourth prong post-*Johnson* under essentially the same circumstances. *See United States v. West Indies Transp., Inc.,* 127 F.3d 299, 306 (3d Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 700, 139 L.Ed.2d 644 (1997); *United States v. Sassanelli,* 118 F.3d 495, 499–500 (6th Cir.1997); *United States v. Knoll,* 116 F.3d 994, 1001 (2d Cir.1997). For example, the Third Circuit refused to correct an erroneous conclusive instruction on the element of materiality in a prosecution under 18 U.S.C. § 1546 for making a false statement on a visa. *See West Indies Transp.,* 127 F.3d at 306. Analogizing to *Johnson,* the court concluded that *Olano*'s fourth prong was not satisfied where the evidence of materiality was overwhelming and uncontroverted, and the defendants failed to present a plausible argument that their statements were not material. *See id.*

In conclusion, while the district court erred with respect to portions of its perjury instructions, none of its errors warrant reversal of Conk's perjury conviction under Federal Rule of Criminal Procedure 52(b). Accordingly, we affirm Conk's conviction on Count 24 for perjury in violation of § 1623(a).[4]

### V.

■ The Defendants next contend that their conspiracy and wire fraud convictions should be reversed on the ground that the district court abused its discretion in admitting, over their objections, two portions of a chart summarizing HLI's loss as a result of their fraudulent activities. *See United States v. Ellis,* 121 F.3d 908, 926 (4th Cir.1997) (a district court's decision to admit evidence over an objection is reviewed for abuse of discretion).

The chart, known as Exhibit MF–4, listed two major categories of HLI loan activity, pre-discovery activity and post-discovery activity, and listed HLI's total loss resulting from Defendants' criminal actions at $3,668,-550. Under post-discovery activity, the chart listed amounts attributable to: (1) "Post Default Interest (Prime + 4%)"; (2) "Collections from Doctors"; (3) "Collections from Wilkinson"; and (4) "Collections from Conk." (J.A. 483).

The Defendants only take issue with the portions of the chart that listed the amount of "Post Default Interest" at $740,335 and "Collections from Doctors" at $1,917,698. According to the Defendants, these amounts should have been excluded, because the government did not offer underlying documentary evidence to support them. *See* Fed. R.Evid. 1006 ("The contents of voluminous writings, records, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at a reasonable time and place. The court may order that they be produced in court.").

We need not decide whether the district court erred in admitting the portions of the chart containing the amounts at issue, because assuming *arguendo* that it did, our review of the record reveals that any error was harmless. *See* Fed.R.Crim.P. 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."). Obviously, the government's point in introducing the summary chart was to show that the Defendants engineered a fraud on HLI that caused it an enormous financial loss. Even without counting the amount of "Post Default Interest" as a loss to HLI, the other figures on the chart revealed that HLI still suffered an enormous financial loss of nearly three million dollars. As for the amount listed as "Collections from Doctors," the Defendants were not prejudiced by the jury's knowledge of this amount, because that figure only

---

**4.** Conk also challenges his perjury conviction on the ground that the element of materiality is not supported by sufficient evidence. For the rea-

sons just stated, we reject his challenge as being without merit.

served to minimize HLI's loss. The critical flaw in Judge Widener's analysis in his dissenting opinion on this issue is that he treats the amount listed as "Collections from Doctors" as counting in the total loss figure of $3,668,550 sought to be proved by the government. In sum, the district court's admission of the challenged portions of the chart does not warrant reversal of the Defendants' convictions for conspiracy and wire fraud.

## VI.

 Conk next challenges the sufficiency of the evidence to support his conviction for bank fraud under 18 U.S.C. § 1344. A majority of the panel consisting of myself and Judge Widener agree that Conk's bank fraud conviction should be affirmed; however, we reach our decision for different reasons, which reasons are stated in our separate opinions arriving at the same result.

## VII.

 We next turn to the Defendants' challenge to the district court's refusal to grant them downward departures in their sentences from the applicable guideline ranges under the United States Sentencing Guidelines. We lack authority to review such a refusal when it rests upon a determination that a departure is not warranted. *See United States v. Bayerle*, 898 F.2d 28, 30–31 (4th Cir.1990). However, we may review the decision of a district court not to depart when that determination is grounded upon a belief that it lacks the legal authority to depart. *See id.* at 31.

Our review of the record reveals that the district court's decision not to depart downward in the Defendants' sentences rested on its determination that a downward departure was not warranted with respect to either defendant. Accordingly, appellate review is precluded.[5]

## VIII.

In conclusion, we affirm all of the Defendants' respective convictions and their respective sentences.

*AFFIRMED.*

WIDENER, Circuit Judge, concurring and dissenting:

## I.

The defendants argue that they are entitled to a new trial on the conspiracy count (Count I) and wire fraud count (Count V) of the indictment.

While I concur in Parts II, III and IV of the opinion of the majority, and in the result obtained in Part VI thereof, as to Part V of the opinion I respectfully dissent. I would grant a new trial on the conspiracy and wire fraud counts.

Part V of the opinion mentions the questioned exhibit, MF–4, which lists two major categories of loan activity and the "total loss resulting [to Health Line] from Defendants' criminal actions at $3,668,550." Maj. p. 229. Of the said sum of $3,668,550, post-default interest of $740,335 and collections from doctors of $1,917,698 were not supported by underlying evidence. This is acknowledged. Thus, the amount of the loss was overstated by the government by $2,658,033, or 72%, hardly an error of little consequence. Despite that, we hold such an error to be "harmless," maj. p. 229, and the defendants were "not prejudiced," maj. p. 229, stating that the "figure only served to minimize HLI's loss." Maj. pp. 229–30.

In my opinion, errors of such magnitude are not harmless and should not be belittled as not prejudicial. Far from merely serving to minimize HLI's loss, the figures show that the government overstated by 72% the fig-

---

5. The Defendants also challenge their sentences on the ground that the district court should have made independent findings with respect to the application of the United States Sentencing Guidelines to the non-money laundering counts, which did not carry the highest offense levels. This challenge is without merit. Our review of the record reveals that the district court properly sentenced the Defendants in accordance with the Guideline section that specifies the procedure for sentencing a defendant in a multiple-count case. *See* U.S.S.G. § 5G1.2.

We also note that the Defendants originally challenged the district court's restitution order. However, they have since abandoned that challenge, citing the doctrine of mootness.

ures underlying the key part of the trial which might well have, and probably did, affect the verdict.

Exhibit MF–4 was the centerpiece of the prosecution of this case; its gross inaccuracy should require a new trial.

## II.

I have concurred in Part VI of the opinion only because the check in the amount of $410,425.56 was delivered to Med Pay a creditor which was owned by the defendants.

Under California Commercial Code § 9306, the lien of the bank remained attached to the check, so the only risk of loss was the solvency of the transferee of the check.

Except in the very unusual circumstances of this case, I think the evidence would have probably been insufficient to support the verdict because, other than the self-dealing, there was no apparent risk of loss, the loan having been timely paid pursuant to an extension granted by the bank.

## III.

I express no opinion on Part VII of the panel opinion. I think that such large parts of the convictions should be set aside that the defendants should be resentenced on all counts following a new trial.

NIEMEYER, Circuit Judge, concurring in part and dissenting in part:

I concur in the opinion of the majority except for part VI. On that part, I dissent.

I do not believe that diverting the proceeds of a check made payable to Day Dream Publishing in which the Bank of Montecito had a general security interest, defrauded the bank when the bank did not know of the existence of the check and did not act either in extending or maintaining credit in reliance on Day Dream Publishing's receiving the check. The defendants could just as well have cashed the Big B check and deposited its proceeds into a Day Dream Publishing account and then written a check in the same amount to themselves. The bank is not defrauded by the day-to-day checking activities of a generally secured borrower unless a particular condition of those activities forms the basis of the security and the bank relied on it. If cashing the check defrauded the bank, then we must conclude that all of the defendants' fraudulent activities did so. Accordingly, I would reverse the conviction on count 11.

HAMILTON, Circuit Judge, writing separately with respect to Part VI:

Conk's conviction for bank fraud must be sustained if there is substantial evidence to support it when the evidence and reasonable inferences from it are viewed in the light most favorable to the government. *See Glasser,* 315 U.S. at 80, 62 S.Ct. at 469–70; *Burgos,* 94 F.3d at 862. As previously stated, "in the context of a criminal action, substantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Burgos,* 94 F.3d at 862.

Title 18 U.S.C. § 1344 provides that:

Whoever knowingly executes, or attempts to execute, a scheme or artifice—

(1) to defraud a financial institution; or

(2) to obtain any of the monies, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises; shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1344. Count 11 of the indictment charged Conk under § 1344(1) and § 1344(2). Specifically, Count 11 charged:

On or about the 18th day of November, 1989, in Richmond, Virginia, in the Eastern District of Virginia and in Montecito, California, in the Central District of California, the defendant EDWARD M. CONK knowingly and willfully executed and attempted to execute a scheme and artifice to defraud the Bank of Montecito, and to obtain money and funds under the custody and control of the Bank of Montecito by means of false and fraudulent pretenses, representa-

tions, and promises in that defendant CONK, in order to repay the loans described in paragraph 3 of this count, caused customer check 255421 from Big B Discount Drugs payable to Day Dream Publishing Inc. in the amount of $410,-425.56 to be endorsed directly over to MedPay and to be deposited into Med-Pay's account at Sovran in Richmond Virginia, thus impairing the Bank of Montecito's security interest in the above check from Big B.

(J.A. 57). The district court similarly charged the jury under both subsections. Where the indictment and instructions to the jury charged both subsections of § 1344, as was done in this case, Conk's bank fraud conviction may be sustained under either subsection. *See United States v. Goldsmith,* 109 F.3d 714, 716 (11th Cir.1997) (sustaining bank fraud conviction only under first subsection of § 1344, even though indictment and instructions charged that the defendant's conduct violated both subsections).

In order to convict Conk of bank fraud pursuant to § 1344(1), the government in this case was required to prove that: (1) Conk knowingly executed or attempted to execute a scheme or artifice to defraud the Bank of Montecito of "*any* property interest," *United States v. Mancuso,* 42 F.3d 836, 845 (4th Cir.1994), (2) which put the Bank of Montecito at an actual or potential risk of loss; and (3) that the Bank of Montecito was a federally insured financial institution, *see United States v. Jacobs,* 117 F.3d 82, 93 (2d Cir. 1997); *United States v. Sapp,* 53 F.3d 1100, 1102 (10th Cir.1995). In order to convict Conk of bank fraud pursuant to § 1344(2), the government in this case was required to prove that: (1) Conk knowingly executed or attempted to execute a scheme or artifice to defraud the Bank of Montecito of monies or funds under the custody, or control of the Bank of Montecito; (2) that the Bank of Montecito was a federally insured financial institution; and (3) that Conk participated in the scheme by means of false or fraudulent pretenses, representations, or promises, which were material. *See* 18 U.S.C. § 1344(2).

Conk contends that his bank fraud conviction cannot be sustained under either subsection, because there is insufficient evidence to support a finding that he knowingly caused the Big B check to be endorsed in favor of MPS. In addition, with respect to the first subsection, he contends that his bank fraud conviction cannot be sustained, because the scheme did not attempt to deprive the Bank of Montecito of any property interest, and the Bank of Montecito was not put at any potential risk of loss as a result of the Big B check being endorsed in favor of MPS. With respect to the second subsection, he contends that his bank fraud conviction cannot be sustained, because the Big B check was not in the custody or control of the Bank of Montecito nor was a false or fraudulent pretense, representation, or promise involved.

After reviewing the sufficiency of the evidence with respect to § 1344(1), I conclude that sufficient evidence exists to sustain Conk's bank fraud conviction under § 1344(1). The record contains the following evidence on the issue of whether Conk knowingly caused the Big B check to be endorsed in favor of MPS: (1) the testimony of Day Dream Publishing's comptroller that although she did not specifically remember endorsing the Big B check issued on November 15, 1989 in favor of MPS, she knew that she would not have done so unless she had been ordered to do so; (2) evidence that Conk was a substantial owner of Day Dream Publishing, who controlled the company directly and through his son, Chip Conk; (3) a memorandum from Chip Conk dated October 11, 1989 to Wilkinson that lists a $497,250 account receivable of Day Dream Publishing from Big B with an expected receipt date of November 1, 1989 as collateral for expected loans from MPS totaling $330,000; (4) evidence that Conk and Wilkinson started MPS in order to financially aid their non medical businesses; (5) evidence that Conk and Wilkinson caused their non-medical businesses to partially repay MPS for any funds advanced to them from MPS; and (6) evidence that Conk was the only meaningful link between Day Dream Publishing and MPS. Looking at this evidence in the light most favorable to the government and drawing all reasonable inferences in its favor, I conclude

that a reasonable finder of fact could accept this evidence as adequate and sufficient to support the conclusion beyond a reasonable doubt that Conk knowingly caused the Big B check to be endorsed in favor of MPS. *See Glasser*, 315 U.S. at 80, 62 S.Ct. at 469–70.

I now turn to consider whether Conk's causing the Big B check to be endorsed in favor of MPS, without the Bank of Montecito's knowledge, defrauded the Bank of Montecito of any property interest as is required to sustain a bank fraud conviction under § 1344(1). *See Mancuso*, 42 F.3d at 845. At trial, the government contended that Conk's endorsement of the Big B check deprived the Bank of Montecito of its security interest in the Big B account receivable and the proceeds thereof. Thus, it must be decided whether a security interest in an account receivable and the proceeds thereof constitute a property interest that will support a bank fraud conviction under § 1344(1).

It is well settled that the scope of a bank's property interests to be protected under the bank fraud statute "is to be construed fairly widely." *Id.* In keeping with this well-settled rule, in *Mancuso*, we held that a debtor's assignment of its rights to the proceeds of job contracts to a bank in exchange for the advancement of funds "f[e]ll within the universe of property that will support" a bank fraud conviction under § 1344(1). *Id.* In so holding, we relied on the fact that the rights to the proceeds of the contracts could be assigned, traded, bought or otherwise disposed. *See id.* The revolving security interest at issue in the case before us is one step removed from a straightforward assignment of rights to the proceeds of a contract or an account receivable, but not a step that makes a difference for purposes of § 1344(1). Rather than holding an absolute right to the proceeds of the Big B account receivable, the Bank of Montecito held a right to acquire the proceeds in the event Day Dream Publishing defaulted on the Note. Like the absolute right to acquire the proceeds of an account receivable, the right to acquire the proceeds of an account receivable upon default of a note can be assigned, traded, bought, or otherwise disposed. The contingent nature of the latter right simply affects the value of

the right, not its ability to constitute a property interest. In sum, I am constrained to conclude that the Bank of Montecito's revolving security interest in the Big B account receivable and the proceeds thereof constitute a property interest protected by § 1344(1).

Turning to the risk of loss issue, I note that the government's theory at trial on this issue was that Conk's causing the Big B check to be endorsed in favor of MPS alienated a significant portion of the Bank of Montecito's collateral, thus creating a potential risk that the collateral would not be available to satisfy the Note if necessary. Conk argues that the Bank of Montecito was never put at a risk of loss by endorsement of the Big B check in favor of MPS, because the Note was over collateralized and Mr. Tobes shared half of the risk of loss on the Note. In support, Conk points to an unaudited financial statement of Day Dream Publishing, dated September 30, 1989 showing six million dollars in current assets and eight million dollars in total assets.

I accept the government's theory. The government did not need to prove that Conk's causing the Big B check to be endorsed in favor of MPS created an *actual* risk of loss for the Bank of Montecito. *See Jacobs*, 117 F.3d at 93; *Sapp*, 53 F.3d at 1102. Rather, the government only needed to prove that Conk put the Bank of Montecito at a *potential* risk of loss. *See id.* After reviewing the evidence, I conclude the government met its burden. Specifically, the evidence established that the absence of the proceeds of the Big B account receivable from the assets of Day Dream Publishing meant a financial loss to the Bank of Montecito if Day Dream Publishing defaulted on the Note and the other collateral available at the time of default was insufficient to satisfy the Note. The fact that the Note may have been overcollateralized at the time of the Big B endorsement and that the Bank of Montecito shared fifty percent of its ownership in the Note with Mr. Tobes did not change this fact. Thus, by definition, Conk's actions with respect to the Big B check put the Bank of Montecito at a potential risk of loss. For these reasons, I vote to affirm Conk's bank

**234**

fraud conviction as supported by sufficient evidence.