**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 20-4393**

_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

KENNETH R. SPIRITO,

Defendant - Appellant.

_____

Appeal from the United States District Court for the Eastern District of Virginia, at Newport News.  Raymond A. Jackson, District Judge.  (4:19-cr-00043-RAJ-DEM-1)

_____

Argued:  September 24, 2021                    Decided:  May 31, 2022

_____

Before GREGORY, Chief Judge, MOTZ, and THACKER, Circuit Judges.

_____

Reversed and vacated in part, affirmed in part, and remanded by published opinion. Chief Judge Gregory wrote the opinion, in which Judge Motz and Judge Thacker joined.

_____

**ARGUED:**  Erin Harrigan, GENTRY LOCKE, Richmond, Virginia, for Appellant. Brian James Samuels, OFFICE OF THE UNITED STATES ATTORNEY, Newport News, Virginia, for Appellee.  **ON BRIEF:**  Raj Parekh, Acting United States Attorney, Alexandria, Virginia, Lisa R. McKeel, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Newport News, Virginia, for Appellee.

_____

GREGORY, Chief Judge:

In 2012, Kenneth R. Spirito and members of the Peninsula Airport Commission began searching for an airline carrier that would bring low-cost air service and attendant passenger traffic to Newport News-Williamsburg International Airport. They came upon a start-up airline called People Express; but People Express had trouble securing funding. So Spirito spearheaded an effort to use restricted state and federal funds as collateral to secure a bank loan for People Express. After People Express defaulted on the loan and millions of dollars were lost, Spirito was indicted, tried, and convicted of federal program fraud, money laundering, and perjury. On appeal, Spirito maintains that there was insufficient evidence to support conviction on some counts, as well as that the district court erred by refusing to give a particular jury instruction, excluding a certain piece of evidence, and entering a forfeiture money judgment without notice. Finding one of these arguments persuasive, we reverse the conviction on Count 19 (a federal program fraud charge for three credit card transactions), and affirm the district court's judgment of convictions and sentences as to the other counts.

I.

A.

Kenneth R. Spirito served as Executive Director of the Newport News-Williamsburg International Airport from 2009 to 2017, and the Peninsula Airport Commission ("PAC")—made up of six individuals appointed by the City of Newport News

and City of Hampton—serves as the airport's governing body.[1]  In his role, Spirito executed the decisions of the PAC and oversaw the airport's daily operations.

The airport receives funds from at least five government programs (individually and collectively, "PAC funds").  State Entitlement funds are subject to Virginia state law and are regulated by the Virginia Department of Aviation ("DOAV").  These funds can be used for capital projects, and the airport must report its use annually via Entitlement Utilization Reports.  The Federal Aviation Administration ("FAA") oversees the remaining four programs:  (i) the Airport Improvement Program requires airport revenue to cover operating and capital needs; (ii) "passenger facility charges" may be used for FAA-approved airport development projects and the airport must submit reports detailing its use against specific projects; (iii) Small Community Air Service Development ("SCASD") funds are reimbursable grants for marketing and air service development after the incursion of expenses related to flights operating at a loss; and (iv) the Regional Air Service Enhancement Group ("RAISE") provides $700,650 in matching funds for money the airport receives from the SCASD and such funds are to be placed in escrow.  At trial, all state and federal regulators testified that, under relevant regulations, manuals, and policies, PAC funds could not be used to collateralize a loan or subsidize an airline.  Several witnesses testified that Spirito knew of these restrictions and that he could contact regulators to clear up any ambiguity regarding the restrictions.

---

[1] The facts described below are drawn from the evidence introduced at trial and viewed in the light most favorable to the government.  *See United States v. Palacios*, 677 F.3d 234, 250 (4th Cir. 2012) (citation omitted).

In 2012, AirTran Airways stopped providing services at the airport. As a result, the airport lost low-cost air service and attendant passenger traffic. Hoping to abate the negative effect on the airport and local community, Spirito and PAC member James Bourey tried to identify and recruit a new air service provider. Eventually, they came upon People Express. At the time, People Express was not operational, but it obtained terminal space rent free at the airport with plans to make the airport its headquarters and start flying by the fall of 2012. But it could not attract investors, so People Express remained grounded.

As 2014 began, People Express still had no planes in the air. It planned a deal with another airline—Vision Airways—to lease planes and crew for use under the People Express name. This deal required People Express to raise at least $10 million. The airline eventually applied for funding from TowneBank, a regional bank headquartered in Virginia. Uninterested in giving People Express a loan because of its lack of tax returns, lack of profitability, and significant debts, TowneBank decided in May 2014 that it would extend a $5 million loan if the airline procured a guarantor and a third-party source of cash collateral. TowneBank required the cash collateral to be placed in accounts with the bank. Once these accounts were funded, the money could not be removed without the bank's approval.

Soon after, Spirito told Bourey and People Express CEO Jeff Erikson that he had a way to make it happen: the loan could be secured using PAC funds. On June 5, Spirito emailed TowneBank confirming the creation of three collateral accounts, providing the titles of the accounts, and noting the total funds that would be put into each account. Spirito met with Renee Carr, the airport's Director of Finance, and instructed her on how to fund

4

the collateral accounts, providing handwritten notes detailing which funds would go into which accounts. When Carr expressed concern about the airport guaranteeing a private loan for People Express, Spirito asked, "Well, do you know what it takes to start an airline?" J.A. 1658.

About two weeks later, it became official: then-PAC Chairperson LaDonna Finch executed various contracts on behalf of the PAC to guarantee performance of a $5 million line of credit issued by TowneBank to People Express. PAC members testified that they did not fully understand the implications of or appreciate that PAC funds would be used as collateral for the loan.[2] And they relied on Spirito for advice and recommendations related to the management of PAC funds. As Spirito confirmed during cross-examination: "[The PAC] executed the [loan] agreement . . . . The funding was my idea."[3] J.A. 2103.

The testimony of Special Agent Christopher Waskey, as well as the bank records introduced at trial, revealed which PAC funds were used to populate each collateral account. Counts 1-6 of the superseding indictment, charging misapplication of funds in

---

[2] Finch did not know specifics about the collateral or understand the details of the loan; Finch admitted to signing the relevant documents after "leaf[ing] through [the] pages." J.A. 755. PAC member George Wallace did not understand that the loan would be guaranteed by the airport. PAC member Stephen Mallon did not understand that the airport was putting its own assets at risk in the form of collateral and was unaware of how the loan guaranty was funded until 2017.

[3] Also in June 2014, Spirito sought RAISE funds for People Express. He procured $700,000, and RAISE had no idea that the funds would be used as collateral for a loan to People Express. After People Express obtained the loan proceeds, it sent $650,650 of the $700,000 to Vision Airways.

violation of 18 U.S.C. § 666(a)(1)(A), relate to Spirito directing the initial transfer of PAC

funds into the collateral accounts in June and July 2014:

- Count 1: $720,000 in State Entitlement funds;

- Count 2: $1,280,000 million in airport revenue;

- Count 3: $700,650 in RAISE funds;

- Count 4: $565,000 in airport revenue;

- Count 5: $385,000 in Passenger Facilities Charges; and

- Count 6: $460,119.37 in State Entitlement funds.

Counts 7-11, also charging misapplication of funds in violation of 18 U.S.C.

§ 666(a)(1)(A), relate to Spirito directing the transfer of additional PAC funds into the

collateral accounts in September, October, and December 2014, as well as January and

April 2015:

- Count 7: $148,213.96 in State Entitlement funds;

- Count 8: $26,000 in Passenger Facilities Charges;

- Count 9: $666,666.66 in State Entitlement funds;

- Count 10: $13,000 in Passenger Facilities Charges; and

- Count 11: $249,312.79 in State Entitlement funds.

In November 2014, People Express fell behind on the interest payments and were

without funds to catch up.  TowneBank turned to the PAC, seeking the money owed.

Between December 2014 and April 2015, Spirito authorized a series of transfers from the

collateral accounts to make interest and principal payments on the loan.  These transactions

support Counts 12-17 of the superseding indictment, charging money laundering in violation of 18 U.S.C. § 1957.

But ultimately, the $5 million loan was not enough to keep People Express in the air. People Express drew down the entire line of credit by August 2014 (one month after the loan's inception), suspended service in September 2014, and defaulted on the loan in January 2015. In early 2015, TowneBank called the loan and cleaned out the collateral accounts to satisfy People Express' debt.

B.

Evidence adduced at trial suggested that Spirito, at the time he ordered the collateral accounts funded and after, concealed the fact that PAC funds were used to guarantee a commercial loan.

For example, the titles Spirito gave to each collateral account—"State Entitlement," "SCASD," and "RAISE"—did not reflect the PAC funds placed into the accounts. J.A. 1666; *see also* J.A. 36–37. The "State Entitlement" account contained State Entitlement funds, airport revenue, and passenger facility charges. *See* J.A. 1664, 1670, 1875, 2017. The "SCASD" account contained airport revenue. J.A. 1664–65. And the "RAISE" account contained RAISE funds and passenger facility charges. J.A. 1669.

In one instance, in the fall of 2014, Spirito instructed airport staff to delay submitting audited financial statements to the City of Newport News because he was concerned that the loan guaranty would be reflected as a potential liability.

In another instance, in May 2014, Spirito submitted a discretionary funds application to the DOAV, but did not tell the state that, at the same time, State Entitlement

7

funds were being committed as collateral for a loan. And Spirito did not include the loan guaranty in the airport's 2014 Entitlement Utilization Report.

The airport did not file its 2015 and 2016 Entitlement Utilization Reports by the relevant deadlines. After several follow-up requests, the reports were submitted in October 2016. As to the 2015 report, Spirito directed the inclusion of an entry entitled "Air Service Development" in the amount of $3.5 million. In early 2017, more than two years after the loan was collateralized and defaulted, Carr revealed in response to an inquiry about the line item that the funds were used for a loan guaranty.

And in another instance, in January 2017, after learning of the defaulted loan via a news article, the FAA emailed Spirito, asking: "How much was paid and specifically what type of funds were used to make the payment?" J.A. 2086. In his response, Spirito stated that State Entitlement, SCASD, and RAISE funds were used, and listed amounts for each. *See* J.A. 2346. He did not reveal that passenger facility charges and airport revenue were also used. This conduct underlies Count 18, charging falsification of records in federal investigations, in violation of 18 U.S.C. § 1519.

Earlier on, when People Express failed, Spirito circulated press talking points that discussed "[f]unds used to help launch an [a]ir [s]ervice," but did not reference the loan guaranty. J.A. 2165. At one point, Spirito told the owner of the airport restaurant that his career in the airline industry "would be over" if the loan guaranty went public. J.A. 1599.

And all the regulator witnesses testified that Spirito did not ask if the PAC funds could be used to guarantee a commercial loan, and they were informed only well after the fact that PAC funds were used this way.

8

C.

In May 2017, the PAC terminated Spirito's employment as Executive Director, after discovering that he used an airport credit card to buy a vehicle warranty and pay for repairs to his personal vehicle. Spirito characterized the auto expenses as "vehicle maintenance" on reimbursement receipts and admitted that he made these purchases and later remitted funds back to the Airport Commission in the amount of approximately $5,800. This conduct underlies Count 19, charging misapplication of funds in violation of 18 U.S.C. § 666(a)(1)(A).

In 2018, Spirito filed a civil defamation suit against the PAC and certain airport employees. He eventually provided testimony in a deposition during which he testified about several matters related to the loan guaranty. He denied using airport revenue as collateral for the loan and said he told the PAC that airport revenue could not be used for this purpose; claimed that he opposed the loan guaranty; and denied his role in designing the collaterization schedule. The statements Spirito made during this civil deposition underlie Counts 20, 21, and 23, charging perjury in violation of 18 U.S.C. § 1623(a).

D.

A superseding indictment charged Spirito with 24 counts, and a forfeiture allegation sought a monetary judgment of $3,817,931.29.

Spirito proceeded to trial on February 25, 2020. During his case-in-chief, Spirito sought to present evidence that, in 2017, the Virginia General Assembly passed Senate Bill 1417, which amended Virginia Code § 5.1-2.16 relating to the use of State Entitlement funds. The amendment added the following sentence to the statute: "State moneys . . .

9

shall not be used for (i) operating costs unless otherwise approved by the Board or (ii) purposes related to supporting the operation of an airline, either directly or indirectly, through grants, credit enhancements, or other related means." J.A. 320. In a letter sent to some members of the Virginia General Assembly (with Wallace and Spirito carbon copied), the Virginia Secretary of Transportation stated that this addition was prompted by the PAC's unauthorized use of state entitlement funds. S.A. 471–72. Spirito's counsel proffered the amendment and letter as evidence that, in 2014, Spirito could use the funds the way he did, as well as evidence that Spirito lacked intent to misuse restricted funds. The district court precluded mention of this evidence.[4]

At the close of his case, Spirito asked the district court to provide the following limiting instruction:

> [E]vidence of alleged violations as to any . . . handbooks, rules, publications, guidelines and regulations should not be considered by you as a violation of criminal law *per se*. You may consider, however, evidence of the . . . handbooks, rules, publications, guidelines and regulations as you would any other evidence in determining whether or not the defendant had the required intent to violate the criminal statute charged in the indictment.

J.A. 2182. The district court refused this instruction, finding that "the charge, as a whole, is sufficient to avoid any confusion that this conduct has to be a violation of [a] criminal statute." J.A. 2216.

---

[4] The district court also excluded evidence related to another airport in Virginia—specifically, in Lynchburg—which used State Entitlement funds for an ineligible project in 2013.

10

The jury returned guilty verdicts on all but one of the counts, acquitting Spirito on one perjury charge (Count 22).

E.

Spirito filed post-trial motions for judgments of acquittal, challenging all counts of conviction. The district court denied these motions except as to Count 24, the conviction for obstruction of justice.

On July 1, 2020, the government filed a motion for a preliminary order of forfeiture, requesting a $3,817,931.29 money judgment, as well as forfeiture of two Wells Fargo bank accounts and two Jeeps. Five days later, on July 6, the district court entered the order.[5] According to trial counsel, "[t]he [preliminary] order expressly incorporates itself into the Judgment." *United States v. Spirito*, No. 4:19-CR-43, (E.D. Va., Pacer No. 138 at 2) (citing Preliminary Order of Forfeiture, ¶ 9); *see* Preliminary Order of Forfeiture, J.A. 2484 ("Pursuant to Rule 32.2(b)(4)(B), this order of forfeiture shall be included in the Judgment imposed in this case."). Spirito did not object to the preliminary order of forfeiture before the sentencing that followed two weeks later, during the sentencing, or before the entry of judgment.

On July 15, the district court departed below the advisory sentencing guidelines range, and sentenced Spirito to 48 months of probation, with a special condition of home

---

[5] According to the preliminary order of forfeiture, the money judgment corresponds with the sum involved in the money laundering transactions for which the jury found Spirito guilty. J.A. 2481.

11

detention for 30 months.  The district court also ordered Spirito to pay $2,511,153.16 in criminal restitution.[6]

Spirito timely appealed.  He challenges the sufficiency of the evidence supporting some of his convictions, as well as the district court's decision not to provide the requested jury instruction; exclusion of evidence regarding the change in state law; and issuance of a forfeiture order without notice.

## II.

## A.

The Court reviews "challenges to the sufficiency of evidence de novo."  *United States v. Graham*, 796 F.3d 332, 373 (4th Cir. 2015).  If, viewing the evidence in the light most favorable to the government, the Court concludes there is substantial evidence to uphold the jury's decision, this Court will affirm the verdict.  *Burks v. United States*, 437 U.S. 1, 17 (1978).  "Substantial evidence is such evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt."  *United States v. Hager*, 721 F.3d 167, 179 (4th Cir. 2013). In reviewing the sufficiency of the evidence, the Court "allow[s] the government the benefit of all reasonable inferences from the facts proven to those sought to be established," *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982), and does not weigh the credibility of the evidence or resolve conflicts in the evidence, *United States v. Beidler*,

---

[6] Spirito does not challenge the district court's order to pay criminal restitution.

12

110 F.3d 1064, 1067 (4th Cir. 1997).  Reversal of a conviction for insufficient evidence is limited to "cases where the prosecution's failure is clear."  *United States v. Foster*, 507 F.3d 233, 244–45 (4th Cir. 2007).

1.

Spirito first argues that there was insufficient evidence for the jury to find him guilty of federal program fraud, as charged in Counts 1-11.  Section 666 prohibits an agent of an organization receiving in any one-year period federal benefits in excess of $10,000 from "embezzl[ing], steal[ing], obtain[ing] by fraud or otherwise without authority knowingly convert[ing] to the use of any person other than the rightful owner or intentionally misappl[ying]" property owned or controlled by that organization and carrying a value of $5000 or more.  18 U.S.C. § 666(a)(1)(A).

Spirito concedes that the government prosecuted him under the theory of "intentional misapplication."  Opening Br. at 28.  Spirito argues that, for several reasons, there was insufficient evidence for a reasonable jury to convict him under this theory. These reasons include that he (i) acted "with[] authority"; (ii) did not receive a "bribe, kickback, or personal benefit"; and (iii) did not "obtain[] the property" of another or "deprive" another of their property.  Opening Br. at 28, 30–31.

First, Spirito contends that he acted at the direction and with the authority of the PAC.  The district court concluded otherwise, explaining:  "[T]he Government presented adequate evidence to support the jury's conclusion that the Defendant—not the [Airport Commission], [its] employees, or [its] counsel—was responsible for allocating restricted

13

funds for a loan guarantee to [People Express]." J.A. 2527. We agree, and Spirito's attempt to blur the facts to prove otherwise is unavailing.

To be clear, the PAC executed the loan guaranty, but Spirito single-handedly decided how to fund the collateral accounts that were pledged in support of the loan. The evidence adduced at trial demonstrated that he knew of the restrictions on the PAC funds; he selected the PAC funds to be placed in the collateral accounts; he named the collateral accounts; he directed the funding of the collateral accounts; and he knew that the PAC would be unable to withdraw funds from the collateral accounts without TowneBank's permission.

The evidence also suggested that Spirito knew that his actions were unauthorized and illegal. He did not seek clarification from state and federal regulators; he used misleading titles on the collateral accounts; he concealed use of the PAC funds by delaying submission of audited financial statements and Entitlement Utilization Reports, and by omitting mention of the loan in the Entitlement Utilization Reports and press talking points; he lied about the use of the PAC funds when directly questioned by the FAA and lied about other issues related to the loan and collateral accounts when questioned during the civil deposition; and, at one point, he proclaimed that his career "would be over" if the loan guaranty went public. This evidence permits a reasonable jury to conclude Spirito did not act at the direction and with the authority of the PAC.

Second, Spirito argues that he did not intentionally misapply the funds because he received no "bribe, kickback, or personal benefit." Opening Br. at 31. But nothing in the

14

statute suggests that a bribe, kickback, or personal benefit must flow from the intentional misapplication of property. The Second Circuit spells this point out well:

> Section 666(a)(1)(A) prohibits embezzling, stealing, obtaining by fraud, converting, or intentionally misapplying funds. The first four prohibitions cover any possible taking of money for one's own use or benefit. Intentional misapplication, in order to avoid redundancy, must mean intentional misapplication for otherwise legitimate purposes; if it were for illegitimate purposes, it would be covered by the prohibitions against embezzlement, stealing, obtaining by fraud, or conversion.

*United States v. Urlacher*, 979 F.2d 935, 938 (2d Cir. 1992). Other sister circuits have also refused to limit intentional misapplication under § 666(a)(1)(A) by applying a personal benefit or illegitimate purpose requirement. *See, e.g.*, *United States v. Cornier-Ortiz*, 361 F.3d 29, 37 (1st Cir. 2004) (citing *Urlacher* to conclude that using funds for legitimate purposes, but in violation of conflict of interest rules, is still an intentional misapplication); *United States v. Shulick*, 18 F.4th 91, 107–13 (3d Cir. 2021) (rejecting argument that a § 666(a)(1)(A) violation under the intentional misapplication theory may never occur unless the defendant misapplied property for his benefit and to the detriment of the proper recipient of federal funds); *United States v. Frazier*, 53 F.3d 1105, 1114 (10th Cir. 1995) (concluding that there was a misapplication even though "[t]he funds were [still] used to purchase computers and computer equipment for the [victim] organization"); *United States v. Freeman*, 86 F. App'x 35, 41 (6th Cir. 2003) (unpublished) (finding no error where district court instructed jury that "[§ 666] prohibits a defendant from intentionally misapplying or misappropriating funds, even if the funds are used for otherwise legitimate purposes"); *United States v. Cameron*, 86 F. App'x 183, 189 (7th Cir. 2004) (unpublished)

15

(concluding that § 666(a)(1)(A) "does not require conversion of funds to one's own use; it requires only an intentional misapplication of funds, even if the funds are used for what would otherwise be a legitimate purpose").

Third, Spirito maintains that he did not "obtain[] the property" of another or "deprive" another of their "property." But the statute requires the "*misapplication*" of property owned by, or under the care, custody, or control of another—it does not require the defendant to "obtain" the property or "deprive" the owner of the property.

Spirito further argues that he made a mere regulatory decision regarding the funds and, even if the decision was bad or made for sinister reasons, it does not amount to the "misapplication" of property. Opening Br. at 31–33. To support this argument, Spirito points to a recent Supreme Court case: *United States v. Kelly*, 140 S. Ct. 1565 (2020). In *Kelly*, two officials in the administration of former New Jersey Governor Chris Christie conspired to shut down toll lanes on the George Washington Bridge to punish the mayor of Fort Lee for refusing to endorse Christie's reelection bid. *Id*. at 1569–70. A jury convicted the two government officials under § 666(a)(1)(A) and the Supreme Court reversed, explaining that the federal program theft statute sought to safeguard against "*property* fraud"—not to "criminaliz[e] all acts of dishonesty." *Id*. at 1571 (emphasis added). In *Kelly*, the government officials never sought "to take the government's property"—they sought only to divert the State's regulatory power to injure a political adversary. *Id*. at 1572. Just as the defendants in *Kelly* merely exercised their regulatory power, Spirito contends, so too did he exercise his right to "allocate[e] airport funds among airport uses," even if such allocations broke the rules. Opening Br. at 35.

16

But Spirito did not use his regulatory power to allocate airport funds "among airport uses." He used his regulatory power to pledge airport funds to a private entity (TowneBank) for the exclusive benefit of another private entity (People Express). In other words, TowneBank was a mere middleman for what amounted to a loan to a private company. Unlike *Kelly*, which involved the use of regulatory power for political retribution, the object of the crime here was property and the goal was to misapply property owned by the airport. And the PAC funds were indeed lost when TowneBank emptied the collateral accounts to satisfy the defaulted loan. As the district court aptly explained: "[A]n intentional, unauthorized distribution of public funds to a private entity falls squarely within the meaning of misapplication as found in § 666(a)(1)(A)." J.A. 2528.

2.

Having found that Spirito's federal program fraud convictions under Counts 1-11 are affirmed, his appeal with respect to the money laundering convictions under Counts 12-17 can now be disposed of rather easily. His sole argument is that the money laundering convictions cannot stand because his federal program fraud convictions are infirm. Opening Br. at 35. Because we affirm his federal program fraud convictions, his sole argument for reversing his money laundering convictions fails.

3.

Spirito next argues that there was insufficient evidence for a reasonable jury to find that his statements to a federal agency as charged in Count 18 were false and made with the requisite intent to impede an investigation. Title 18 U.S.C. § 1519 "requires the government to prove the following elements: (1) the defendant made a false entry in a

17

record, document, or tangible object; (2) the defendant did so knowingly; and (3) the defendant intended to impede, obstruct, or influence [a federal] investigation." *United States v. Powell*, 680 F.3d 350, 355–56 (4th Cir. 2012). Spirito challenges the second element only.[7]

According to Spirito, the government did not provide sufficient evidence for a jury to find that he violated § 1519 upon sending his 2017 email in response to the FAA's question about "[the] type of funds [] used to make the [loan] payment." Opening Br. at 44–45; S.A. 420. Spirito maintains that "[t]he government did not point to evidence to show that [his] statements were knowingly false at the time they were made, aside from pointing to the evidence adduced in support of Counts 1 through 17." Opening Br. at 45.[8]

In his email response to the FAA, Spirito stated that the loan used about $3.5 million in State Entitlement Funds, $300,000 in SCASD funds, and $700,000 in RAISE funds. S.A. 420. This response was false because it omitted mention of the airport revenue and passenger facility charges used and mentions SCASD funds, which were not in fact ever used.

---

[7] Spirito also states that "the government has failed to prove that . . . he acted with intent to obstruct a federal investigation." Opening Br. at 46. Such a bare assertion—unadorned by argument—does not preserve a claim.

[8] The government contends that Spirito waived this argument and—if reviewable—it fails on plain-error review. *See* Response Br. at 34; *United States v. Robinson*, 744 F.3d 293, 298 (4th Cir. 2014) ("Where courts may review a forfeited claim for plain error, a claim that has been waived is not reviewable on appeal, even for plain error.") We need not decide whether Spirito waived or forfeited this claim because it fails even under de novo review.

Spirito's arguments to the contrary are unavailing. First, he asserts that "[t]he government elicited testimony from its own witness that calls . . . into question" whether he "knowingly" provided false statements as suggested by the evidence adduced in support of Counts 1-17. Opening Br. at 45. Spirito points to the testimony of Michael Swain, a supervisor at the DOAV, who Spirito maintains provided evidence suggesting that he properly used State Entitlement Funds and passenger facility charges. Reply Br. at 19–20. But Spirito does not suggest that this witness provided evidence tending to show that he properly used airport revenue—a line item omitted from the email response to the FAA. Moreover, even assuming the government's witness "called into question" the issue of whether Spirito properly used government funds, "determining witness credibility and weighing conflicting evidence are the responsibility of the factfinder." *United States v. Chavez*, 894 F.3d 593, 608 (4th Cir. 2018). So, to the extent there existed conflicting testimony about Counts 1-17—and thereby, the mens rea element in Count 18—we are unpersuaded by Spirito's argument. *United States v. Millender*, 970 F.3d 523, 529 (4th Cir. 2020) ("[W]e assume that the jury resolved any conflicting evidence in the prosecution's favor."); *United States v. Northcutt*, 619 F. App'x 235, 236 (4th Cir. 2015) ("[W]e do not review the jury's credibility determination . . . .").[9]

Second, Spirito suggests that he did not "knowingly" provide a false statement because any falsehood he may have told was "unwitting." Opening Br. at 45. This

---

[9] Spirito's perjury conviction related to his denial of using airport revenue further supports the conclusion that the jury resolved credibility determinations as to the mens rea element of the § 1519 violation against Spirito.

19

argument is belied by the record. Spirito was questioned about his email response while on the stand, and he did not claim that his answers were mistaken; he maintained that he responded accurately.

For these reasons, the evidence was sufficient for a reasonable jury to find that Spirito's statements to a federal agency as charged in Count 18 were false and made with the requisite intent to impede an investigation, in violation of 18 U.S.C. § 1519.

4.

Spirito next challenges the federal program fraud conviction related to the three unauthorized credit card transactions, as charged in Count 19.

Recall that § 666 prohibits an agent of an organization receiving in any one-year period federal benefits in excess of $10,000 from "embezzl[ing], steal[ing], obtain[ing] by fraud or otherwise without authority knowingly convert[ing] to the use of any person other than the rightful owner or intentionally misappl[ying]" property owned or controlled by that organization and carrying a value of $5000 or more. 18 U.S.C. § 666(a)(1)(A).

The question presented is whether § 666(a)(1)(A)(i) criminalizes multiple conversions of less than $5,000, if the government must point to conversions that took place over more than one year to reach the $5,000 statutory minimum. Spirito notes that, though the three transactions totaled just over $5,000, they occurred over the course of a year and a couple of days. Those couple of days, Spirito argues, save him from culpability under § 666(a)(1)(A). The government contends that a § 666 violation occurs even when a defendant converts property valued at $5,000 beyond a one-year time frame. The district court denied Spirito's motion for judgment of acquittal as to this issue, explaining: "[T]he

20

Court [] rejects Defendant's request to impose a one-year temporal limitation on his conversion of PAC funds. . . . The Fourth Circuit is going to have to set its own precedent on this because the Court has an issue [here]." J.A. 2531 (third alteration in original) (internal quotation marks and citation omitted).

We first look to the language of the statute to resolve this dispute. The government correctly states that, though subsection (b) prohibits converting the funds of an organization that receives, "in any one year period, benefits in excess of $10,000," 18 U.S.C. § 666(b), the subsection establishing the $5,000 conversion threshold, 18 U.S.C. § 666(a)(1)(A)(i), includes no such temporal limit. But we must also consider "the specific context in which that language is used, and the broader context of the statute as a whole." *Yi v. Fed. Bureau of Prisons*, 412 F.3d 526, 530 (4th Cir. 2005) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). The phrase "in any one-year period," as associated with the $10,000 federal funding requirement, is defined as "a continuous period that commences no earlier than twelve months before the commission of the offense or that ends no later than twelve months after the commission of the offense" and "[s]uch period may include time both before and after the commission of the offense." 18 U.S.C. § 666(d)(5). In other words, the one-year time restriction related to the $10,000 federal funding requirement can be satisfied in one of three ways: the one-year period can (i) start 12 months before the conversion, (ii) end 12 months after the conversion, or (iii) include time both before and after the conversion. Considering that the one-year period can include time both before and after the conversion, the statute most naturally reads as requiring the offense to fall

21

within a 12-month window.[10]  In other words, the government must present evidence showing that, within a one-year period, the defendant committed one or more acts of conversion with an aggregate value of $5,000 or more.[11]

Our reading is not contrary to clearly expressed congressional intent.  Congress enacted § 666 as part of the Comprehensive Crime Control Act of 1984.  Pub.L. No. 98–473, 98 Stat. 1837 (1984).  According to the Senate Report, the purpose of § 666 was to "augment the ability of the United States to vindicate *significant acts* of theft, fraud, and bribery involving Federal monies that are disbursed to private organizations of State and local governments pursuant to a Federal program."  S.Rep. No. 225, 98th Cong., 2d Sess. 369, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3510 (emphasis added).  Congress intended the terms of the statute to be construed "consistent with the purpose of this section to protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery."  S.Rep. No. 98–225 at 370; 1984 U.S.C.C.A.N. at 3511.  "The phrase 'significant acts of theft, fraud, and bribery' suggests that Congress did not intend the statute to reach theft of minimal amounts . . . ."  *United States v. Valentine*, 63 F.3d 459, 463 (6th Cir. 1995).  The temporal limitation requirement, paired with the

---

[10] *See United States v. Valentine*, 63 F.3d 459, 463 (6th Cir. 1995) (concluding the same and explaining that "[t]he interrelationship between subsections (a) and (b) of the statute mandate that a one-year limitation likewise attaches to the $5,000 threshold requirement").

[11] *See also Valentine*, 63 F.3d at 463 (noting that the statute is violated by a $5,000 theft only "if the circumstance described in subsection (b) . . . exists" and subsection (a) specifically incorporates the elements of subsection (b), and concluding that, "if subsection (b) contains a time restraint, it is applicable to subsection (a)").

monetary threshold requirement, brings this stated objective to life:  without the temporal limitation, the government could aggregate small thefts over years, decades, or even a defendant's lifetime to meet the $5,000 statutory minimum.  In other words, the government's proposed statutory construction would nullify congressional intent by allowing the statute to reach insignificant acts of theft over an indefinite time period.

Our conclusion that § 666 requires each transaction used to reach the aggregate $5,000 requirement to occur within the same one-year period aligns with the conclusions of other circuit courts that have considered the issue.  *Valentine*, 63 F.3d at 464 (concluding that "[t]he interrelationship between subsections (a) and (b) of the statute mandates that a one-year limitation likewise attaches to the $5,000 threshold requirement"); *United States v. Hines*, 541 F.3d 833, 837 (8th Cir. 2008) (concluding that "[s]ignificant longstanding schemes that extend for longer than one year . . . may be charged in multiple counts so long as the $5,000 requirement is met in each one-year time period" "wherein the government agency or organization received $10,000 or more in federal funds"); *United States v. Newell*, 658 F.3d 1, 24 (1st Cir. 2011) ("We have previously held that the government may aggregate transactions occurring within a one-year time period in order to meet the $5000 jurisdictional minimum of § 666(a)(1)(A)." (first citing *United States v. Cruzado-Laureano*, 404 F.3d 470, 484 (1st Cir. 2005); then citing *Hines*, 541 F.3d at 837)).[12]

---

[12] This result also aligns with our unpublished decision in *United States v. Doty*:

> We do not suggest, and need not find, that this aggregation has no bounds.  Although the statute does not explicitly articulate a temporal limitation, it does provide a context clue.  To be

(Continued)

23

The government states that "[t]he First Circuit has ruled that by the plain text of the [statute] the one-year limitation in § 666(b) does not require a court to 'treat[] all qualifying transactions within a one-year period as aggregated together to state one offense under § 666(a)(1)(A).'" Response Br. at 43 (third alteration in original) (quoting *Newell*, 658 F.3d at 24). Instead, the government argues, "the First Circuit 'concluded the unit of prosecution in § 666(a)(1)(A) is transactional,'" *id.* (quoting *Newell*, 658 F.3d at 24), and "'each theft or group of thefts equaling at least $5000' is a unit of prosecution," *id.* (quoting *United States v. Ayala*, 821 F. App'x 761, 763 (9th Cir. 2020)), as long as the unit of prosecution involves a "singular stream" of transactions and not "multiple distinct transactions," *id.* at 42–43 (quoting *United States v. Lopez-Cotto*, 884 F.3d 1, 11–12 (1st Cir. 2018)).

The government misreads the decisions it cites. The *Newell* court said that cases like the one at bar did not resolve the controversy before it, explaining:

> prosecuted under § 666(a), "the circumstance described in subsection (b) of [that] section [must] exist[ ]." 18 U.S.C. § 666(a). The relevant "circumstance" is that the government organization "receives, in any one year period, benefits in excess of $10,000 under a Federal program." [18 U.S.C.] § 666(b). And the one-year period must be "a continuous period that commences no earlier than twelve months before the commission of the offense or that ends no later than twelve months after the commission of the offense" and may include "time both before and after the commission of the offense." [18 U.S.C.] § 666(d)(5). Conditioning the commission of the offense on the "exist[ence]" of this "circumstance" at least suggests a temporal limit.

832 F. App'x 174, 180 n.4 (4th 2020) (internal citations omitted).

> [Those] cases were concerned with the propriety of aggregation when the transactions involved sums which fell below the jurisdictional minimum and hence did not make out independent violations of § 666. However, one of the rationales for allowing aggregation under such circumstances is to ensure that poorly motivated officials do not evade liability under § 666 simply by stealing less than $5000 at a time. *See Webb*, 691 F. Supp. at 1168; *Sanderson*, 966 F.2d at 189. Worries about opportunistic evasion of liability do not apply to transactions that involve sums larger than the statutory minimum. Since most of the bundled transactions in this case involved sums greater than $5000, it is not clear whether this line of precedent would support the aggregation that occurred in this case.

658 F.3d at 24–25 (citing *Cruzado–Laureano*, 404 F.3d 470; *Hines*, 541 F.3d 833). The question in *Newell* was whether the transactions bundled under counts 2, 7, 8, 9, 11, 29 and 30 were duplicitous—that is, whether they described distinct violations of § 666(a)(1)(A) and another statutory provision. *Id.* at 23. Though the *Newell* court pontificated about a problem that could arise when bundling transactions involving amounts less than $5,000, it only held that the bundled transactions in that case, which involved amounts more than $5,000, "were duplicitous, and that the failure to provide a specific unanimity instruction was error." *Id.* at 28. And notably, when noting that the First Circuit "[has] previously held that the government may aggregate transactions occurring within a one-year time period in order to meet the $5000 jurisdictional minimum of § 666(a)(1)(A)," *id.* at 24 (citing *Cruzado-Laureano*, 404 F.3d at 484), the *Newell* court cited to the Eighth Circuit's decision in *Hines*, which found that § 666 permits the government to aggregate multiple transactions in single count to reach the $5,000 minimum as long as the transactions fall within a one-year period, *id.* (citing *Hines*, 541 F.3d at 837). Still, as the *Newell* court

25

made clear, *Cruzado-Laureano*, *Hines*, and other like-cases were not dispositive of the controversy before the court. *Id.*

Moreover, contrary to the government's suggestion, the *Ayala* court also did not decide whether a one-year temporal limitation applies in a case like this one; instead, it concluded that it need not decide because, "even if the district court erred in failing to treat § 666(a)(1)(A) as transactional, as opposed to calendar-based, that error [was] not plain." 821 F. App'x. at 763. And the *Lopez-Cotto* court considered whether the government may prove an agreement for the ongoing stream of benefits worth at least $5,000, rather than an agreement for stand-alone bribes—it did not consider whether stand-alone bribes that occur beyond a period of one year may be aggregated to satisfy the $5,000 statutory minimum. 884 F.d at 8 (describing a "stream of benefits" prosecution approach as one in which a government official "enter[s] into an ongoing agreement to accept benefits in exchange for providing government business to the briber" and, "in the aggregate, under the ongoing scheme, the government business conferred had a value of at least $5,000").[13]

---

[13] The government also argues that "the jury could have determined that the conversion of funds occurred within a one-year period." Response Br. at 40. The government explains: "[With] the posting date on the credit card statement reflecting payment for the first transaction was on November 28, 2014, and Spirito ma[king] payment on the third transaction on November 27, 2015 (with the obligation of funds beginning even earlier when repairs commenced), Spirito either obligated funds or made payments to which he was not entitled within a one-year period." *Id.* at 40–41.

We cannot accept this unreasonable interpretation of the record. Spirito first obligated funds to which he was not entitled on November 25, 2014—the day he first swiped his airport-issued credit card to cover an impermissible expenditure; this transaction happened to be posted on the credit card statement on November 28. S.A. 444; *see also* J.A. 1817–25. He last obligated funds to which he was not entitled on November 27, (Continued)

26

Because § 666 requires each transaction used to reach the $5,000 statutory requirement to occur within the same one-year period, we reverse Spirito's conviction on Count 19.

5.

Spirito further complains that there was insufficient evidence for a reasonable jury to find that his sworn statements charged in Counts 20, 21, and 23 were false and material to the civil matter in which those statements were made. Recall that Count 20 charged Spirito with making false statements when he testified that he did not divert airport revenue for the loan guaranty. J.A. 361–63. Count 21 charged Spirito with making false statements when he testified that he opposed the loan guaranty while the PAC supported it. J.A. 364–65. And Count 23 charged him with making false statements when he testified that he did not know that TowneBank would not lend money to People Express without a loan guaranty and that he had no role in selecting and authorizing the funds to be placed in the collateral accounts. J.A. 369–71.

A defendant commits perjury under 18 U.S.C. § 1623(a) when he has "(1) knowingly made a (2) false (3) material declaration (4) under oath (5) in a proceeding

---

2015—the day he used the credit card to pay for a third unauthorized expenditure; this transaction happened to be posted on November 30. S.A. 465; *see also* J.A. 1810. Whether we look to the November 25, 2014 and November 27, 2015 credit card transaction dates, or the November 28, 2014 and November 30, 2015 credit card transaction posting dates, the conversions occurred over the course of one year and two days. The government does not explain why we should mix-and-match the transaction and transaction posting dates when considering this issue. In our view, it seems illogical to resolve this issue by considering the transaction date related to one conversion and the posting date related to another conversion. Nor does the government explain how Spirito managed to obligate funds when the repairs began (and before any credit card transaction occurred).

27

before or ancillary to any court of the United States." *United States v. Wilkinson*, 137 F.3d 214, 224 (4th Cir. 1998). Spirito does not deny making these statements. Nor does he reject the government's assertion that they were false, made under oath, and in an ancillary proceeding. Instead, he contends that these statements were immaterial.

"A statement is material if it has a natural tendency to influence, or is capable of influencing, the decision-making body to which it was addressed." *United States v. Littleton*, 76 F.3d 614, 617–18 (4th Cir. 1996). This Court observed in *Wilkinson* that, because "a deponent's testimony is not actually addressed to a decision-making body," the materiality standard "does not neatly apply when, as here, the defendant is charged with committing perjury during a civil deposition." 137 F.3d at 225.

The Second and Fifth Circuits have adopted broad standards for evaluating the materiality of a statement made during a civil deposition. *United States v. Holley*, 942 F.2d 916, 924 (5th Cir. 1991) (explaining that material statements include those "with respect to matters properly the subject of and material to the deposition, even if the information elicited might ultimately turn out not to be admissible at a subsequent trial"); *United States v. Kross*, 14 F.3d 751, 754 (2d Cir. 1994) (explaining that statements made in civil depositions are material when "a truthful answer might reasonably be calculated to lead to the discovery of evidence admissible at the trial of the underlying suit"). The Sixth Circuit has adopted a narrower materiality standard for civil depositions. *United States v. Adams*, 870 F.2d 1140, 1147 (6th Cir. 1989) (holding that "a false statement during a civil deposition is material if the topic of the statement is discoverable and the false statement itself had the tendency to affect the outcome of the underlying civil suit for which the

28

deposition was taken"). In *Wilkinson*, this Court did not reach the question of which standard of materiality should apply to statements made in the context of a civil deposition because the statements at issue met the most stringent standard. 137 F.3d at 225, 228–29.

Spirito encourages this Court to adopt a narrower approach. But more importantly, Spirito contends that, "[i]n order to answer [the materiality] question, the government must offer evidence to show, *at a minimum*, the nature of the underlying civil proceeding." Opening Br. at 52. Here, Spirito argues, "the government did not introduce any evidence about the nature of the underlying civil litigation and pointed simply to the evidence adduced at trial regarding the program fraud counts in the criminal case." *Id.*

But this is not true. Consider the following exchange during Spirito's cross-examination:

> Q. And describe what happened . . . when you first interacted with the agents.
>
> A. Well, the doorbell rang, and I answered the door, and a gentleman and a representative from the . . . Department of Transportation . . . identified themselves. They . . . said, [w]e would like to ask you some questions about the People Express loan and, I guess, the airport's involvement in that. . . .
>
> Q. Now, at that time, did you think or know that you were a suspect?
>
> A. Well, no. No. Because *I was involved in a civil suit* and . . . they were going to ask me questions. *I assumed they were . . . . going to ask me questions about the People Express loan and the airport's involvement while my civil suit was in federal court*.
>
> Q. *You were the plaintiff in that civil suit?*
>
> A. *Yes.*

29

Q. *You were suing the Peninsula Airport Commission, correct?*

A. *Yes. . . .*

Q. All right. Now, did there come a point [during] the [] visit where you spoke with your lawyer?

A. Well, . . . I invited them in the house, *and when it became apparent to me that I probably should have my attorney at the time at least on the phone*, because I just didn't know what to do, I mean . . . was going to answer the questions, but I didn't want to have—you know, I had a light bulb go off in my head, like, oh, *maybe it's going to interrupt my civil suit*, and *I don't know if that conflicts.* So I contacted my attorney, and *my attorney said, in fact, it was going to, possibly.* . . . So we were going to contact them at a later date, but the civil suit was getting heavier and heavier post-February.

Q. Okay. And ultimately, agents came back to your house in May of 2019, correct?

A. Yes. . . .

Q. And, Mr. Spirito, *in the course of that deposition, you were also asked many questions about the credit card usage* that you've testified to about here today, correct?

A. *Yes.*

Q. *Because your performance and some of the issues that occurred while you were employed at the airport were issues that were subjects of inquiry at the deposition?*

A. *That's correct.*

J.A. 2064–66, 2093 (emphasis added).

Spirito's argument—which focuses on whether the government offered any evidence of the underlying proceedings—fails because, as can be seen, the government did offer such evidence during the trial. Spirito testified that, when investigators first attempted to interview him, he was a plaintiff in a civil lawsuit against the PAC. He "assumed" the

30

investigators were "going to ask [him] questions about the [People Express] loan and the airport's involvement," which he thought were so connected to his civil defamation suit that answering the investigator's questions may "interrupt" or "conflict[]" with the civil suit. J.A. 2065–66. And, "[his] attorney said, in fact, it was going to, possibly." *Id.* Though both Spirito and his attorney used qualifying language to describe the potential impact of the deposition testimony on the underlying civil suit, the government did present evidence on the underlying civil defamation case and that evidence was sufficient for a reasonable jury to find that Spirito's false declaration met even the more stringent materiality standards.

## B.

Spirito next contends that the district court erroneously rejected his request to instruct the jury that a violation of a policy, guideline, or regulation does not amount to a crime, thereby inviting the jury to convict him for civil infractions, not federal program fraud and money laundering.

This Court reviews a district court's refusal to give a jury instruction for abuse of discretion. *United States v. Brooks*, 928 F.2d 1403, 1408 (4th Cir. 1991). Such refusal is only reversible error if the instruction (i) was correct; (ii) was not substantially covered by the court's charge to the jury; and (iii) dealt with some point in the trial so important that

31

failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense. *United States v. Lewis*, 53 F.3d 29, 32 (4th Cir. 1995).[14]

Spirito asked the district court to instruct the jury that:

> [E]vidence of alleged violations as to any . . . handbooks, rules, publications, guidelines and regulations should not be considered by you as a violation of criminal law *per se*. You may consider, however, evidence of the . . . handbooks, rules, publications, guidelines and regulations as you would any other evidence in determining whether or not the defendant had the required intent to violate the criminal statute charged in the indictment.

J.A. 2182. The district court refused this instruction, finding that "the charge, as a whole, is sufficient to avoid any confusion that this conduct has to be a violation of [a] criminal statute." J.A. 2216. To be sure, the proposed instruction is a correct statement of law and would draw a clear line between the appropriate use of civil regulations to define the contours of a criminal law and the inappropriate replacement of a criminal law with civil regulations, but the district court's charge to the jury substantially covered the proposed instruction.

As to federal program fraud, the district court instructed:

> In order to prove the defendant guilty . . ., the government must prove each of the following elements beyond a reasonable doubt: Number one, . . . the defendant was an agent of . . . The Peninsula Airport Commission . . .; Number two, that in . . . calendar years of 2014 and 2015, the Peninsula Airport Commission received federal benefits in excess of $10,000;

---

[14] Spirito states that this issue should be reviewed de novo because it concerns whether "a jury instruction failed to correctly state the applicable law." *United States v. Raza*, 876 F.3d 604, 613–14 (4th Cir. 2017). The question here is not that. As Spirito concedes in his briefs, the question is whether the district court erred in failing to instruct the jury. *See* Opening Br. at 36, 37.

> Three, that the defendant . . . intentionally misapplied property;
> Four, that such property was in the care, custody, and control
> of the Peninsula Airport Commission; and, Five, that the
> provider of such property had an aggregate value of at least
> $5,000.

J.A. 2335–36. As to the "intentional misapplication" theory, the district court explained:

> To intentionally misapply money or property means to
> intentionally use money or property of the [] Airport
> Commission knowing that such use is unauthorized or
> unjustifiable or wrongful. Misapplication includes the
> wrongful use of the money or property for an unauthorized
> purpose, even if such use benefitted the [] Airport Commission.

J.A. 2337. And as to intent, the district court said:

> The term "intentionally[]" . . . means that he knowingly
> performed an act, deliberately and willfully on purpose as
> contrasted with accidentally, carelessly, or unintentionally. . . .
>
> The intent of a person or the knowledge that a person possesses
> at any given time may not ordinarily be proved directly because
> there's no way of scrutinizing the workings of the human mind.
> In determining the issue of what a person knew or what a
> person intended at a particular time, you may consider any
> statements made or acts done or omitted by that person and all
> other facts and circumstances received in evidence which may
> aid in your determination of that person's knowledge or intent.
> . . . It is entirely up to you, however, to decide what facts to
> find from the evidence received in the trial.

J.A. 2327–29.

The jury instructions make clear that, to convict Spirito, the jury must conclude that

he "misapplied" the funds—i.e., used them for "an unauthorized purpose"—and that he did

so "intentionally"—not accidentally. Spirito's civil violation-transformed-to-crime

accusation cannot be reconciled with the district court's separate and distinct instruction

on "intent," which makes clear that something more than a regulatory violation is required.

33

This specific-intent aspect of the instruction disabuses a juror of any notion that mere misapplication of funds or violation of a regulation, standing alone, amounts to criminal liability.[15] *See United States v. Herder*, 594 F.3d 352, 360–61 (4th Cir. 2010) (sustaining jury charge that did not include a "mere proximity" instruction because the instructions given required proof of knowledge and control).  Nor was there any statement regarding civil or administrative law incorporated in the jury instructions that could confuse the jury into finding criminal liability on that basis alone.  *But cf. United States v. Ransom*, 642 F.3d 1285 (10th Cir. 2011) (affirming conviction where district court instructed jury on specific regulation and further instructed that regulatory violation was not "a violation of criminal law *per se*" but was relevant to the defendant's intent).  Instead, the district court told the jury to look to "all [] facts and circumstances received in evidence" to determine "[Spirito's] knowledge or intent" and explained that "[i]t is entirely up to [them] [] to decide what facts to find from th[at] evidence."  J.A. 2319, 2329.  This instruction would not permit the jury to convict Spirito had the government's proof shown no more than a civil or administrative law violation.

Thus, the district court did not abuse its discretion in denying Spirito's requested jury instruction.

---

[15] In his reply brief, Spirito argues that, "[i]n enacting 18 U.S.C. § 666, Congress never intended a jury to wade through a complex web of overlapping federal and state regulations, or to interpret a government agency policy manual, to determine whether a defendant had committed the crime of federal program fraud."  Reply Br. at 1.  Spirito did not make this argument in his opening brief.  And, no doubt, it was appropriate for the jury to consider any handbooks, rules, publications, guidelines, and regulations to determine whether the funds were "misapplied."

C.

Spirito also challenges the district court's exclusion of evidence related to a change in state law and another entity's operations under that law. Spirito asserts that this evidence was critical to his defense against the government's theory that he acted in violation of state policies in allocating airport funds. We afford substantial deference to the district court's decision to admit or exclude evidence and will not reverse absent an abuse of discretion. *See United States v. White*, 810 F.3d 212, 227 (4th Cir. 2016).

Trial counsel sought to introduce evidence of the January 2017 letter written by the Virginia Secretary of Transportation and a copy of the legislation discussed in it, explaining:

> [W]hen the jury has to determine if there was a misappropriation, they will have to determine if there was a law that this use of State entitlement funds violated, and in determining if there's been a violation of the law, . . . a relevant factor . . . is . . . if the people who make the laws decided they had to change it so as to make this act subsequently illegal. . . . [I]f the legislature turns around and changes the law for the specific reason of making this illegal, then it can follow . . . that before they changed the law, it wasn't illegal.

J.A. 1934–35. The trial court denied trial counsel's request to introduce evidence of the amended state statute, explaining: "No, it doesn't follow. It may follow that they amended the law in some way. It doesn't mean that it was not improper or unlawful before the fact." J.A. 1935. We agree.

Evidence of the amended state statute would not help the jury determine the legality of Spirito's actions because, even if the state legislature added a line that makes obvious

35

the prohibition on the conduct that catalyzed this case, it does not mean that the conduct was lawful before the statute's amendment.

Even if the district court had abused its discretion, any error was harmless. *See* Fed. R. Crim. P. 52(a); *United States v. Johnson*, 617 F.3d 286, 292 (4th Cir. 2010) (explaining that evidentiary rulings are subject to harmless error review). The January 2017 letter specifically noted that using "$3.55m in state funds to pay off the loan" was an "unauthorized use of state entitlement funds." S.A. 472. In addition, as discussed above, Spirito concealed his use of PAC funds to fund the collateral accounts. With this overwhelming evidence of the illegality of his actions, any error did not prejudice Spirito.[16] *See United States v. Caldwell*, 7 F.4th 191, 206–07 (4th Cir. 2021) (citing *United States v. Baxter*, 54 F.3d 774, at *6 (4th Cir. 1995) (per curiam) (finding an abuse of discretion when the court refused to permit questions related to the key government witness's juvenile adjudication but nevertheless concluding the error was harmless because the witness's "credibility was attacked on the stand despite the exclusion of the juvenile adjudication evidence" and there was otherwise "overwhelming evidence of [the defendant's] guilt")).

### D.

Finally, we consider Spirito's arguments regarding the forfeiture money judgment. To the extent that Spirito's cursory reference to the forfeiture amounting to an excessive

---

[16] Spirito also contends that the district court erred by excluding evidence as to the circumstances surrounding the Lynchburg airport's use of "ineligible" funds in 2013. Opening Br. at 41. Considering the overwhelming evidence discussed above, any error did not contribute to the outcome.

36

fine in violation of the Eighth Amendment is sufficient to raise the issue on appeal, *see* Opening Br. at 55–57, his argument is not persuasive.

We weigh several factors to determine whether a challenged forfeiture amounts to an excessive fine:  (i) the nature and extent of the illegal activity; (ii) whether the defendant fit into the class of persons for whom the statute was principally designed; (iii) the harm caused by the charged crime; (iv) the amount of the forfeiture and its relationship to the authorized penalty; and (v) the relationship between the crime charged and other crimes. *United States v. Bajakajian*, 524 U.S. 321, 337–39 (1998)).  Spirito concedes that he did not raise this excessive fine issue below.  Thus, plain error review applies.

As an initial matter, Spirito's laundering activities, which involved $3,817,931.29, could have subjected him to a criminal fine of up to $7,635,862.58—a total that far exceeds the amount to be forfeited.  "Such punishment does not suggest 'a minimal level of culpability.'"  *United States v. Jalaram, Inc.*, 599 F.3d 347, 356 (4th Cir. 2010) (quoting *Bajakajian*, 524 U.S. at 339).  In addition, Spirito argues that "to hold him responsible for the full amount of the loss is grossly disproportional to the gravity of [his] actions" because the PAC voted to issue and carry out the contractual obligations associated with the loan, and ultimately, "he acted with the best of intentions and without obtaining any personal benefit." Opening Br. at 56–57.  Even if true, Spirito does not explain how these facts pull him outside of the class of persons for whom the money laundering statute was principally designed, negate the harm caused by his money laundering activities, or change the close relationship between the money laundering and federal program fraud crimes.  For these reasons, we find that the forfeiture order does not constitute an excessive fine and, at a

37

minimum, any contrary conclusion on the part of the district court did not rise to the level of plain error.

Spirito also argues that the district court erred in entering a forfeiture order without providing him notice and an opportunity to be heard. Under the rule governing forfeiture in criminal cases, a court shall not enter a judgment of forfeiture unless the defendant first receives notice via the indictment or information that the government will seek forfeiture as part of any sentence. Fed. R. Crim. P. 32.2(a). Second, the court must determine, as soon as is practicable following a verdict of guilty on the substantive charges, what property is subject to forfeiture,[17] and enter a preliminary order of forfeiture. Fed. R. Crim. P. 32.2(b)(1)-(2). "Unless doing so is impractical, the court must enter the preliminary order sufficiently in advance of sentencing to allow the parties to suggest revisions or modifications before the order becomes final as to the defendant under Rule 32.2(b)(4)." Fed. R. Crim. P. 32.2(b)(2)(B). "Third, "[a]t sentencing[,] . . . the order of forfeiture becomes final," Fed. R. Crim. P. 32.2(b)(4)(A), and "[t]he court must include the forfeiture when orally announcing the sentence or must otherwise ensure that the defendant knows of the forfeiture at sentencing," Fed. R. Crim. P. 32.2(b)(4)(B). "The court must also include the forfeiture order, directly or by reference, in the judgment, but the court's failure to do so may be corrected at any time under Rule 36." Fed. R. Crim. P. 32.2(b)(4)(B).

---

[17] "If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense. If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay." Fed. R. Crim. P. 32.2(b)(1)-(2).

Spirito complains that the district court signed the preliminary order less than 14 days after the draft order was submitted by the government, thereby depriving him of any meaningful opportunity to challenge the money judgment as a violation of his Eighth Amendment right to be free from excessive fines.[18] Spirito further argues that the district court erred in neither mentioning forfeiture when orally announcing his sentence nor taking steps to ensure that Spirito knew of the forfeiture at the time of his sentencing. Spirito concedes that he did not raise these objections below; thus, plain error review applies.

In *United States v. Martin*, the district court ordered criminal forfeiture of the appellants' property, but did not reference forfeiture when sentencing appellants. 662 F.3d 301, 307 (4th 2011). We explained that Rule 32.2's requirement that district courts "include the forfeiture when orally announcing the sentence or [] otherwise ensure that the defendant know of the forfeiture at sentencing" is "not [meant] to create a coercive sanction, but to ensure that a defendant is on notice as to all aspects of his sentence, including forfeiture." *Id.* at 309 (emphasis omitted). We affirmed the criminal forfeiture of the appellants' assets because "there [was] no dispute that [the] [a]ppellants were fully aware of both the pending forfeiture itself and . . . the exact amount." *Id.* The appellants "[did] not—and indeed could not—argue that they were caught off-guard" because the district court held hearings on forfeiture, in which both the fact of liability and the amount were determined, and made clear at the end of the final forfeiture hearing that it intended to enter the forfeiture order. *Id.*

---

[18] Under the Eastern District of Virginia's Local Criminal Rule 47(F)(1), opposing parties shall file response briefs within 14 calendar days after service of a motion.

This case presents no substantial difference. Spirito had notice that forfeiture would be a part of his case through the issuance of a Presentence Investigation Report, motion for a preliminary order of forfeiture, and preliminary order of forfeiture—the latter two of which noted the precise forfeiture amount. J.A. 2600, 2465–66, 2474, 2479, 2481–83.[19] And trial counsel conceded, in Spirito's reply to his Motion to Stay Forfeiture Pending Appeal filed below, that "[t]he [preliminary] order expressly incorporates itself into the Judgment." *United States v. Spirito*, No. 4:19-CR-43, (E.D. Va., Pacer No. 138 at 2) (citing Preliminary Order of Forfeiture, ¶ 9); Opening Br. at 22 n.7 (noting motion to stay forfeiture order). So Spirito understood that, if he did not object sometime before the district court entered judgment, he would have to forfeit the specified amount. Yet Spirito made no attempt to object during the nine days that passed between entry of the preliminary forfeiture order and sentencing. Nor did he object during or immediately after sentencing. Instead, he waited 41 days after sentencing—until the day the government seized a bank account belonging to him and his family—to object for the first time.

Ultimately, because Spirito, like the appellant in *Martin*, was "indisputably on notice at the time of sentencing that the district court would enter [a] forfeiture order[]" and had ample opportunity to object, "we refuse to vacate the district court's [] forfeiture order[]." 662 F.3d at 309–10.

---

[19] Forfeiture was also mentioned in the superseding indictment, but that document noted "[a] monetary judgment in the amount of not less than $4,563,312.78, representing the proceeds of the scheme alleged in Counts 1-11," J.A. 373—not the ultimate $3,817,931.29 money judgment, which represented the proceeds of the money laundering scheme alleged in Counts 12-17.

III.

For the foregoing reasons, we reverse and vacate the conviction and sentence on Count 19, and affirm the convictions, sentences, and judgment on the remaining counts. We remand to the district court with instructions to conduct such further proceedings as may be appropriate and consistent with this opinion.

*REVERSED AND VACATED IN PART,*
*AFFIRMED IN PART, AND REMANDED*